DeALMEIDA, P.J.T.C.
This opinion sets forth the court’s findings of fact and conclusions of law after trial in the above-captioned matters.
I. Introduction
Plaintiff owns or leases seven parcels of real property in Atlantic City on which is located the Borgata Hotel and Casino. The complex, referred to in this opinion as “the Borgata,” includes the Borgata Hotel, the Water Club Tower hotel, a large casino, restaurants, bars, entertainment venues, retail stores, spas, pools, parking lots and associated amenities. The parcels operate as a single economic unit. As part of a revaluation of all real property *475 in the city for tax year 2008, the municipal tax assessor set assessments on the parcels totaling approximately $2.21 billion. The assessments were increased to approximately $2.26 billion for tax years 2009 and 2010, the periods addressed in this opinion. Plaintiff challenged the assessments for those tax years, arguing that they exceed the true market value of the property as of October 1, 2008 and October 1, 2009, the relevant valuation dates. The municipality filed counterclaims for each year seeking to raise the assessments.
After careful consideration of the evidence admitted at trial, the court concludes that plaintiff is entitled to a significant reduction in the assessments on the subject property for both tax years. There is little doubt that during the years in question the Borgata was the premier casino-hotel in Atlantic City. The facility is beautifully designed, well-appointed and attracts clients interested in a luxury hotel-spa experience and high-end gaming, shopping, entertainment and dining. In addition, during the periods at issue, plaintiffs casino-hotel was well managed and consistently led the Atlantic City market in gaming and hotel room revenue.
The facility's success after its 2003 opening resulted in two major expansions shortly before the relevant valuation dates. The original Borgata Hotel, a 43-story structure, had 2,001 rooms and a casino, restaurants, pools, retail space and other amenities. In 2007, plaintiff expanded the casino and added restaurant space and a nightclub to the facility. In June 2008, shortly before the first valuation date, plaintiff opened the Water Club Tower, a 38-story luxury hotel, with 798 additional hotel rooms, numerous pools, exceptional spa facilities, additional retail space and other amenities.
At first blush, these findings would suggest that the Atlantic City casino-hotel market was thriving during the periods at issue. On closer examination, however, the evidence admitted at trial establishes that beginning in 2007 and continuing to 2009 powerful forces were combining to undermine the Atlantic City casino-hotel market in ways that threatened lasting adverse economic consequences. By October 1, 2008, the first valuation date, the national *476 economy had suffered a significant downturn, an unprecedented drop in the value of the stock market, the failure of major banking institutions, and a dramatic tightening of the credit market. These factors undercut consumer confidence, restricted investment opportunities in the gaming industry and placed serious stress on the ability of customers to spend money on the type of luxury hotel and gaming experience on which the Borgata had built its success. Although the full extent of the national economic downturn was not known on October 1, 2008, knowledgeable participants in the casino-hotel market would have had a pessimistic outlook on the Borgata’s future earning potential as of that date.
In addition, and perhaps more importantly, by October 1, 2008, it was readily apparent that Atlantic City’s long-held near monopoly on East Coast gaming was rapidly being eroded by the expansion of casino gaming in nearby States. While Atlantic City has always been the only municipality in New Jersey in which casino gaming is permitted, beginning in 2006 the States surrounding New Jersey authorized a significant expansion of gaming opportunities within driving distance of many of the customers on which Atlantic City depends. The Borgata, like all Atlantic City gaming venues, relies heavily on customers who travel to the city by car from relatively close proximity to gamble and spend money at casino-hotels. By October 1, 2008, seven gaming facilities with slot machines had opened in Pennsylvania alone. These facilities serve clientele that might otherwise drive to Atlantic City to spend money gambling, eating and renting a hotel room. As of that date, an additional seven slot-machine casinos were authorized under Pennsylvania law, but not yet constructed. Two of those casinos were slated to open in 2009, one in Bethlehem, a convenient and readily accessible location to the many New York City gamblers previously targeted by Atlantic City casino-hotels. Two other slot-machine casinos were planned for Philadelphia, a major source of customers for Atlantic City casino-hotels. Plaintiff produced credible expert testimony that this change was not a short-term setback. The gaming market had been reset and the *477 economic prospects for Atlantic City’s casino-hotels dimmed for the foreseeable future.
The situation only worsened by October 1, 2009, the second valuation date. By that time, the national economic condition had deteriorated and the expectation of a long-term period of economic stagnation had taken hold among investors and the public. The likelihood of a lengthy recovery period further soured the prospects for the Borgata maintaining its net revenue or experiencing an increase in net revenue in the near future. In addition, the spread of casino gaming in Atlantic City’s feeder markets continued unabated. By late 2009, a virtual wall of casinos, constructed or planned, arose along the Pennsylvania-New Jersey border from Bethlehem to South Philadelphia and continued into northern Delaware. These casinos, which offered slot machines, restaurants and other amenities attractive to the Borgata’s targeted customer base, skimmed clients from Atlantic City casino-hotels at a growing rate. Also by October 1, 2009, bills authorizing table games at casinos were pending in the Pennsylvania legislature and appeared likely to be enacted into law, further darkening the financial prospects of Atlantic City casino-hotels.
Because the court concludes that the income approach to valuation is the most credible method for determining the true market value of the subject property, these market changes are important to the court’s resolution of the parties’ claims. While the Borgata remains a luxury facility with fine features and high-end amenities, the subject property does not have the market value it once did during Atlantic City’s near monopoly on gaming. On October 1, 2008 and October 1, 2009, any reasonable participants in the casino-hotel market would, when negotiating a sales price for the subject property, project declining near-term profits and a stabilized future income below that which the Borgata had historically enjoyed. These projections would result in a negotiated true market value significantly below the assessments on the subject property, warranting a reduction in the assessments for each tax year.
*478 The court is mindful of the fact that the determination of the true market value of real property, particularly real property as complex and intertwined with a commercial enterprise as is the subject property, is not an exact science. Reasonable, experienced experts can differ on how best to predict the market’s reaction to developing trends in the national economy and regional gaming competition. It is the court’s obligation, however, to determine which of the expert opinions offered at trial, if any, provides the most credible evidence of the subject property’s value on the relevant valuation dates. The court concludes that the opinion offered by one of plaintiffs appraisal experts is the most credible evidence of true market value of the subject property before the court. The court adopts that opinion.
The expert opinion offered by the municipality in support of the assessments did not fully account for the powerful economic and competitive factors undermining the subject property’s market value on the relevant valuation dates. That expert’s prediction of future net revenue from the Borgata relied too heavily on the subject property’s past successful performance during better economic times and prior to the growth in regional competition. In addition, the municipality’s expert failed to account adequately for the value of the intangible business assets of the Borgata when formulating an opinion of value under the income approach. As a result, the court concludes that the opinion of true market value offered by Atlantic City, while undoubtedly based on the expert’s sincerely held opinion, was not as credible as the opinion offered by plaintiffs appraisal expert.
II. Findings of Fact and Procedural History
The following findings of fact are based on the testimony of the trial witnesses and exhibits introduced into evidence.
A. The Subject Property.
Plaintiff Marina District Development Company, LLC (“MDDC”) is a joint venture between Boyd Gaming Corporation and MAC Corporation, which is wholly owned by MGM Mirage. MDDC owns one of the parcels at issue here (Block 576, Lot 1.03) *479 and leases the remaining parcels from MAC Corporation, the fee simple owner of those lots.
The property, commonly known as One Borgata Way, is situated on the north side of Huron Avenue and the south side of Clam Thorofare, in the marina district of the city adjacent to the Absecon Inlet. The parcels total approximately 45.49 acres zoned for hotel-casino operations as part of the Huron North Redevelopment Area. The redevelopment area was created to permit the transformation of a former landfill into three large casino-hotel resorts. MGM Grand, Inc. acquired the property in 2000 and MGM Mirage reclaimed the landfill, developed infrastructure and entered into the joint partnership MDDC. MGM Mirage contributed the land and Boyd Gaming Corporation contributed approximately $90 million and became the operating partner of the venture.
The Borgata first opened in July 2003. The original hotel had 2,001 rooms in 43 stories as well as a casino. The room mix subsequently was refigured and, as of the valuation dates, the original hotel had 1,970 rooms. In June 2006, the “Northern Expansion” of the casino floor opened, adding approximately 520 slot machines, 42 table games, a 100-seat race book, a poker room, three signature restaurants, a food court and a nightclub. In June 2008, approximately four months prior to the first valuation date, the Borgata opened the Water Club Tower expansion, a 38-story, 798-room hotel, which includes five pools, the Immersion Spa and fitness center, the Sunroom lounge, a pool snack bar and a retail promenade with five stores. In 2007 and 2008, other capital improvements included a new parking garage, a new casino entry, and the refurbishment and conversion of some public space to smoking lounges.
As of the valuation dates, the Borgata consisted of 3,508,231 square feet of gross building area and approximately 7,675 parking spaces in three parking structures, as well as 900 surface parking spaces. The facility has 2,768 hotel rooms, 62,248 square feet of banquet and meeting space and 16,200 square feet of *480 theater space, two spas comprising 42,490 square feet, and several indoor and outdoor pools.
The gaming facilities included 160,287 square feet of casino area, of which approximately 136,667 square feet constitute the casino floor. The remaining gaming facilities space is comprised of a cash room, cashiers, and the back of the house facilities. As of December 2007, the casino had 4,027 slot machines, 93 poker tables, and 179 table games offering blackjack, craps, baccarat, roulette, Pai Gow and other games. The poker room is approximately 20,489 square feet in size and hosts daily poker tournaments and an annual poker tournament with a large prize pool.
The sub-level basement includes a cafeteria-style eatery with approximately seven food vendors. Also on the sub-level basement are a lounge, nightclub, mechanical areas, storage facilities, administrative offices and employee facilities.
The first floor of the main hotel casino includes the casino floor, the hotel lobby-reception area, a 940-seat theater, business center, back of the house facilities, seven fine dining restaurants (including kitchens and service facilities), a buffet restaurant (with kitchen and service facilities), two retail plazas, a high-limit game area, a nightclub, casino cage, poker room, security offices, cash services and bars. The first floor of the Water Club Tower includes an additional retail plaza, lounge/bar, business center, indoor pool area with lap pool, outdoor spa facilities, and a separate lobby-reception area.
The mezzanine of the main facility includes the banquet space, meeting rooms, executive offices, employee facilities, laundry, medical clinic, surveillance room and IT services. The mezzanine of the Water Club Tower includes meeting space, board rooms and a terrace balcony.
The main hotel has a spa/pool area. The Water Club Tower has a spa/pool area on the 32nd floor. The Immersion Spa in the Water Club Tower contains a lap pool and Jacuzzis with spa treatment areas, a fitness center, lounges and locker rooms.
*481 All of the facilities are in excellent condition. Interior finishes include custom carved wood, limestone, onyx, marble, granite and colored glass. There are custom features, architectural elements and fine art, sculptures and glass fixtures throughout the property. The overall appearance of the casino-hotel is one of luxury and fine appointments.[1]
B. The National Economic Downturn.
The national economy began to soften in late 2007, primarily due to the subprime housing crisis. By October 1, 2008, the economy suffered a significant downturn triggered by the collapse of the mortgage markets and the failure of Bear Stearns and Lehman Brothers. The government-sanctioned bailout of Bear Stearns as a banking institution “too big to fail” set off alarms concerning the stability of the American banking system. The mid-September 2008 collapse of Lehman Brothers led to a sharp drop-off in the stock market and the beginning of the worst recession since the Great Depression.
In addition, the tourism industry faced a significant public stigma nicknamed the AIG effect. In 2008, American International Group, Inc., or AIG, a multinational insurance company, experienced a serious public relations backlash after it hosted a lavish corporate event during the height of the national economic crisis. The bad publicity caused other corporate entities to cancel events and to be more hesitant about hosting corporate functions at high-end resorts, such as the Borgata. These economic forces had a detrimental effect on the Borgata’s revenues. The stagnant national economy affected consumer confidence, inhibiting spending on luxuries and entertainment.
*482 By October 1, 2009, the national economic condition had further deteriorated. According to one expert who testified at trial “as of October 1, 2009, the macro economy had entered into what many commentators termed a ‘New Normal,’ meaning that the developed nations would enter into a prolonged period of low growth, high unemployment and a need for de-leveraging. This would add to the uncertainty surrounding the gaming industry in general and in Atlantic City specifically, as of the valuation date.” Unemployment rates started to increase significantly in 2008 and were still rising as of September 2009. This fact is significant because low unemployment rates are indicative of increased consumer spending on such discretionary items as gaming and entertainment. The perception that the nation’s economic trouble was not a transitory downturn, but a long-term reealibration of the economy, was hardening among the public and participants in the financial markets as of the second valuation date.
C. Increase in Regional Competition for Gaming Revenue.
Atlantic City casino-hotels have historically relied on customers who arrive by automobile. In 2008, 81.4% of Atlantic City visitors arrived by ear and 15.4% arrived by bus. Visitors arriving by automobile have been growing as a percentage of total visitors since 1992. Only a small portion of visitors arrive by air, highlighting the local and regional nature of Atlantic City as a destination. Atlantic City casino-hotels have relied most heavily on patrons from New Jersey, Pennsylvania, New York and Delaware.
In 2004, Pennsylvania enacted legislation allowing for the first time the installation and operation of slot machines at licensed gaming facilities. The law authorized the issuance of 14 slot-machine gaming licenses for locations throughout the State. As of October 1, 2008, seven slot-machine casinos had opened in Pennsylvania. Although two of the slot-machine casinos opened prior to October 1, 2008 are in the Pittsburgh area, the remainder are in eastern Pennsylvania, within driving distance of many of the Borgata’s customers. The resulting impact on revenue at the Borgata was established at trial. In addition, by October 1, 2008, two additional slot-machine casinos — the Sands Bethlehem and the *483 Rivers Casino — were scheduled to open in 2009. The Bethlehem facility is closer to New York City by car than is the Borgata. That casino provides a convenient location for a large number of gaming customers who might otherwise drive to Atlantic City. Two additional slot-machine casinos were planned for Philadelphia.
As of October 1, 2009, the second valuation date, the situation had worsened for the Atlantic City casino-hotel industry. Both the Sands Bethlehem and the Rivers slot-machine casinos had opened in Pennsylvania. Pending bills in the Pennsylvania Legislature to permit table games at casinos in that State were seen as likely to pass. The introduction of table games in Pennsylvania would allow casinos there to compete more directly with Atlantic City casino-hotels.
D. The Weakening Atlantic City Casino-Hotel Market.
As of October 1, 2008, the Atlantic City gaming industry was showing signs of distress. The Revel, a 1,900-room, high-rise, luxury casino-hotel on the Atlantic City boardwalk was partially built. The project’s anticipated completion date was summer 2010, although the prospects for the project’s continued construction were uncertain. Plans for a $1.5 billion resort casino-hotel by Pinnacle Entertainment at the site of the former Sands Casino Hotel near the Revel project were placed on hold as of October 1, 2008. Also placed on indefinite hold as of October 1, 2008 were plans for the construction on the 72-acre parcel adjacent to the Borgata of the MGM Grand Atlantic City with three hotel towers holding 3,000 rooms, a large casino and 50,000 square feet of retail space. In the summer of 2008, the Tropicana Atlantic City casino-hotel entered bankruptcy after its gaming license was revoked for a “demonstrated lack of financial integrity.”[2]
*484 As of October 1, 2009, construction of the Revel was indefinitely suspended. In addition, the sale of Bader Field, a decommissioned municipal airport in Atlantic City, for redevelopment as a casino-hotel had been indefinitely suspended. By October 1, 2009, Trump Entertainment, which owned three Atlantic City casino-hotels, joined the Tropicana in bankruptcy proceedings. In March 2009, management of the Borgata opted to close the Water Club Tower Tuesdays through Thursdays between November and May because of lack of demand.
All three appraisal experts to testify at trial agreed that gaming revenue in the Atlantic City casino-hotel market declined during the period 2007 to 2009. The Borgata was the best performing of the casino-hotels during that time. Yet, the subject property generated less revenue than would be expected with the opening of its new hotel tower and expanded casino. The Borgata experienced a significant dip in revenue in 2009.
E. The Assessments.
The assessments on the subject property for tax year 2009 are as follows:
[[Image here]]
For tax year 2010, the assessments were carried forward, with one exception. The assessment on Block 576, Lot 1.11 was raised *485 to $188,558,100, apparently because the completion of the Water Club Tower in 2008 resulted in a partial assessment for 2009. The tax year 2010 assessment on that parcel was allocated as $23,921,100 for land and $164,637,000 for improvements. This brings the total assessment for tax year 2010 to $2,262,391,300.
The average ratio for Atlantic City for tax year 2009 is 100.46%. See N.J.S.A. 54:1-35a(a). The average ratio for Atlantic City for tax year 2010 is 102.16%.
F. The Tax Court Complaints a,nd Counterclaims.
On March 30, 2009, plaintiff filed Complaints with this court challenging the tax year 2009 assessments on the subject property. The municipality filed Counterclaims with this court on April 7, 2009, seeking to raise the assessments on the subject property for tax year 2009.
On March 18, 2010, plaintiff filed Complaints with this court challenging the tax year 2010 assessments on the subject property. The municipality filed Counterclaims with this court on April 12, 2010, seeking to raise the assessments on the subject property for tax year 2010.
The matters proceeded through discovery together and were consolidated for purposes of trial and this opinion.
G. Pretrial Proceedings.
Both parties filed pretrial motions to exclude testimony from the experts offered by their opponents. On March 14, 2013, the court, after hearing oral argument from counsel, denied the municipality’s motion to exclude plaintiffs experts. The court thereafter held a two-day, pretrial hearing pursuant to N.J.R.E. 104 with respect to plaintiffs motion to exclude the municipality’s appraisal expert. On April 1, 2013, the court denied plaintiffs motion.
H. The Trial.
During twenty-one days of trial, the parties presented the testimony of five experts to assist the court in determining the *486 trae market value of the subject property. Plaintiff produced two real estate appraisers with significant experience valuing casinos and casino-hotels. Two additional experts called by plaintiff, an economics professor and a casino-industry analyst, provided testimony concerning economic obsolescence and casino-hotel capitalization rates. The municipality presented one real estate appraiser who has long-time experience appraising Atlantic City easinohotels. The experts agreed that the highest and best use of the subject property is as a casino-hotel and that the Borgata was well managed on the relevant valuation dates. The court accepts those conclusions and considered them to be true for the purpose of this opinion.
1. Plaintiffs First Appraisal Expert.
Plaintiffs first appraisal expert has fifty years of experience in appraising real property. He has appraised casinos and casino-hotels for more than forty years, having offered opinions of value with respect to more than 200 casino-hotels, including four casino-hotels in Atlantic City. Over the municipality’s objection, he was qualified as an expert in the appraisal of real estate and the appraisal of casino-hotels. He relied on the income approach to formulate an opinion of value of the subject property. He was of the opinion that the income approach is the primary, if not sole, method used in the marketplace to anive at a purchase price for casino-hotel properties. He credibly testified that it is exceedingly rare for a casino-hotel enterprise to sell only its real property. In the marketplace, casino-hotel sales include all of the assets of an ongoing business enterprise, including personal property and the business operations, along with the real property. Because the sale of the subject property would necessarily involve the sale of the Borgata’s ongoing business enterprise, plaintiffs first appraisal expert determined a true market value for the entire casino-hotel enterprise. From this value he extracted the true market value of the personal property, commonly known as the furniture, fixtures, and equipment, as well as the true market value of the casino-hotel business — including all elements of the *487 going concern — to determine the true market value of the real property.
Many of the precedents from this court employ the direct capitalization method when determining the true market value of income-generating real property. Under that method, projected net income of the property is divided (or capitalized) by a rate of return derived from transactions in the marketplace, surveys and/or a weighted cost of capital. Parkway Village Apartments Co. v. Township of Cranford, 108 N.J. 266, 270, 528 A.2d 922 (1987); Hull Junction Holding Corp. v. Borough of Princeton, 16 N.J.Tax 68, 79 (Tax 1996). According to the credible testimony of the appraisal experts for both parties, for a casino-hotel, a direct capitalization rate can be derived from the value conclusion reached through application of what is known as an EBITDA multiple. Marketplace participants determine the sales price of a casino-hotel by calculating the property’s EBITDA, or earnings before interest, taxes, depreciation and amortization, in the trailing twelve months leading to the date on which a sales price is determined. An EBITDA multiple is negotiated by market participants based on an assessment of risk regarding the property’s capacity to generate EBITDA during a holding period. The more likely it is that the casino-hotel will maintain or increase its EBITDA, the more likely that the parties will agree on a higher EBITDA multiple. The more likely it is that the casino-hotel will suffer a decrease in EBITDA the more likely the parties will agree on a lower EBITDA multiple. Application of an EBITDA multiple to the property’s EBITDA results in a sales price. The capitalization rate for the transaction can be derived using a simple mathematical formula once the sales price, projected EBITDA and the EBITDA multiple are known.
With respect to tax year 2009, plaintiffs first appraisal expert began his net operating income analysis for the subject property by examining actual income and expenses reported by the Borgata for income tax purposes for the years 2005 to 2008. To the Borgata’s reported net operating income he added back expenses deducted by the Borgata for depreciation and amortization. While these expenses are appropriately deducted for federal income tax *488 purposes, they are not deducted as expenses for purposes of determining value under the income approach. In addition, the expert added back rent that the Borgata paid to MAC Corporation on the ground lease for the parcels not owned by plaintiff. This add-back allows for the valuation of a fee simple interest in the subject property, as required by New Jersey law. The expert also added back pre-opening expenses associated with the expansion of the casino floor and the opening of the Water Club Tower, as those expenses are non-recurring and would not appropriately be considered when determining a stabilized net operating income over the expected holding period of the subject property.
After these adjustments, plaintiffs first appraisal expert calculated net EBITDA as follows
2005 S256,474,000
2006 S250.095.000
2007 S246,560,000
Because the relevant valuation date for tax year 2009 is October 1, 2008, at the time of the hypothetical sale, the buyer and seller would have data relating to only the nine months ending September 30, 2008. Plaintiffs first appraisal expert, therefore, used the same approach to calculate net EBITDA for the nine months ending September 30, 2007 and September 30, 2008. He calculated those figures as follows:
09/30/07 $197,170,000
09/30/08 $173,871,000
The expert noted that by the end of September the Borgata had earned between 80% and 86% of its income for the calendar year, even though only 75% of the year has passed. He attributed this to increased revenue for Atlantic City casino-hotels in the summer months.
These figures show a steady decline in net income beginning in 2006, even with the expansion of the casino in 2007 and the opening of the Water Club Tower hotel in June 2008. This is true because an increase in gross income from those expansions was offset by additional expenses associated with operating the expanded casino and new hotel/spa facility.
*489 The expert opined that a hypothetical buyer and seller would on October 1, 2008 consider the expansion and expected further expansion of casino gaming in the Borgata’s market as a major factor when negotiating a projected stabilized net EBITDA for the subject property. He opined that the expanded competition created instability in the Atlantic City casino-hotel market and uncertainty as to when and if stabilization would occur for the subject property. In addition, he offered the opinion that the general declining national economy as of October 1, 2008 and its impact on consumer confidence and the availability of consumer funds for gaming and entertainment would influence the determination of a stabilized net EBITDA for the subject property.
The expert ultimately opinioned a stabilized net EBITDA for tax year 2009 of $230,000,000.
With respect to tax year 2010, plaintiffs first appraisal expert applied the same methodology to calculate the following net actual EBITDA for the period 2005 through 2008:
2005 $256,474,000
2006 $250,095,000
2007 $246,560,000
2008 $203,056,000
He calculated net EBITDA for the periods ending September 30 as follows:
09/30/08 $173,871,000
09/30/09 $171,180,000
Again, although gross revenues increased in 2008 from the expanded casino and hotel, net income dropped because of increased expenses associated with the first full-year of operation of the Water Club Tower.
The expert stabilized net EBITDA for the subject property for tax year 2010 at $213,000,000. He considered in his determination of a stabilized net EBITDA the further expansion of casino gaming in the Borgata’s market, as well as the continued and deepening decline in the national economy. In addition, the expert considered the continued decline in net EBITDA and the then approximately year-old implementation of the partial smoking ban in Atlantic City.
*490 When formulating his opinion on stabilized net EBITDA, plaintiffs first appraisal expert did not consider actual income and expense data from any period after the relevant valuation dates. He credibly testified that consideration of such evidence would not be appropriate because a hypothetical buyer and hypothetical seller on the valuation dates would not have the benefit of actual income and expense data from subsequent periods when negotiating the true market value of the property.
Plaintiffs first appraisal expert examined casino-hotel sales from across the country to identify a range of EBITDA multiples for purposes of determining a market EBITDA multiple for the subject property on the two valuation dates. The expert analyzed the same casino-hotel transactions for both tax years. Having found no casino-hotel sales in New Jersey which were arms’ length transactions, the expert relied on casino-hotel sales in Nevada, as well as riverboat casino sales in Mississippi, Indiana, Missouri and Louisiana. He determined both the sales price and the trailing twelve-month EBITDA for each transaction. From that information he calculated the EBITDA multiple for each sale.
The EBITDA multiples for the Nevada casino sales ranged from 3.81 to 5.9. The EBITDA multiples for the riverboat sales ranged from 3.7 to 5.78. All of the sales occurred prior to the economic downturn of late 2008 and in locations in which there was fairly substantial gaming demand and no threat of significant growth in competition. The expert converted the EBITDA multiples to capitalization rates, which ranged from 17% to 26.22% for the Nevada casino-hotel sales and 17.3% to 27% for the riverboat sales.
Included among the sales on which plaintiffs first appraisal expert relied was the March 2009 sale of the Treasure Island casino-hotel in Las Vegas. Treasure Island is a casino-hotel constructed in 1992. It has 2,885 rooms, fifteen restaurants, over 1,600 slot machines, 74 table games, a sports book, Keno, 55,000 square feet of gaming space and 5,800 parking spaces. This transaction was the subject of extensive testimony at trial.
*491 While plaintiffs two appraisal experts agreed that the Treasure Island sale was first publieally announced in December 2008, no expert could identify with certainty the date on which the parties to the transaction reached agreement on a purchase price. The date on which the parties came to agreement on a purchase prices is important, given that the EBITDA multiple is determined by considering the EBITDA for the twelve months preceding the date on which the sales price was determined. Conflicting accounts of negotiations for the Treasure Island sale were reported in newspaper articles offered at trial. Because those articles were themselves hearsay and were embedded with additional hearsay statements, the court did not admit the articles into evidence.[3]
Plaintiffs first appraisal expert offered the opinion that the terms of the transaction were agreed upon in mid-2008, prior to October 1, 2008, the first valuation date, and prior to the significant drop in the national economy. The expert reported that the property sold for $775 million. He opined an EBITDA multiple for the sale of 7.01, which converted to a capitalization rate of 14.3%. This capitalization rate is lower than the ranges for the sales he previously identified. He explained this by noting that the Treasure Island was one of the premier hotels in Las Vegas, was on the famed Las Vegas strip, the country’s premier gaming location, and that the purchase price was negotiated in a stable market. Cross-examination revealed that the purchase price effectively was reduced to $755 million by the early payment of debt *492 by the purchaser. This changed the EBITDA multiple for the sale to 6.8, which converts to a capitalization rate of 14.7%.
For both tax years, plaintiffs first appraisal expert selected an EBITDA multiple of 5 for the subject property, which converts to a capitalization rate of 20%. This rate reflects, in the opinion of plaintiffs first appraisal expert, not only the increased and increasing competition in Atlantic City on the two valuation dates, but also the overall deteriorating economic trends for the general economy as of October 1,2008 and October 1, 2009.
Applying this capitalization rate to his opinion of net EBITDA, plaintiffs first appraisal expert opined a value of $1,150,000,000 for the entire casino-hotel enterprise as of October 1, 2008 ($230,000,-000 -7- .20 = $1,150,000,000). The expert opined that the value of the real property could not possibly exceed this amount for tax year 2009, given that this value includes all elements of the casino-hotel operation.
With respect to tax year 2010, applying the capitalization rate to his opinion of net EBITDA, plaintiffs first expert opined a value of $1,065,000,000 for the entire casino-hotel enterprise as of October 1, 2009 ($213,000,000 * .20 = $1,065,000,000). The expert opined that the value of the real property could not possibly exceed this amount for tax year 2010, given that this value includes all elements of the casino-hotel operation.
From these amounts plaintiffs first appraisal expert deducted the business or ongoing concern value. He made this determination through application of an artificial management fee. See Glenpointe Assocs. v. Township of Teaneck, 10 N.J.Tax 380, 391 (Tax 1989), aff'd, 12 N.J.Tax 118 (App.Div.1990). This approach to valuation, known as the Rushmore approach, which will be discussed in greater detail below, has long been recognized for use in valuing hotels. See Prudential Ins. Co. v. Township of Parsippany-Troy Hills, 16 N.J.Tax 58, 60 (Tax 1995). The appraisal theory uses the hypothesis that the property owner employs a professional management agent to take over the day-to-day operations of the business enterprise. This premise puts the property owner in the position of a passive investor in real property who *493 makes no profit from the business operation conducted at the property. The business value — deducted in the form of a hypothetical market rate management fee — represents the value of the business enterprise. See Westmount Plaza v. Township of Parsippany-Troy Hills, 11 N.J.Tax 127, 135 (Tax 1990).
No outside management contracts for Atlantic City casino-hotels were in place on the valuation dates. Similarly, no outside management contracts existed for the major casino-hotels in Nevada as of the valuation dates. However, plaintiffs first appraisal expert estimated a hypothetical management fee based on his experience with internal management contracts at casino-hotels in Nevada. In his opinion, such contracts generally have rates of 5% to 6% of gross revenues.
With respect to tax year 2009, plaintiffs first appraisal expert applied these percentages to both the actual gross revenue for 2007, and actual gross revenue for the first nine months of 2008. He reconciled these figures to arrive at an estimated fee of $60,000,000. Because it is the expert’s experience that management companies pay the salaries of the top manager and two assistants under the top manager, he deducted from his estimated management fee $1,129,000 that the Borgata paid to its top manager and two assistants. This resulted in an estimated management fee of $58,871,000 to deduct for business value, leaving an estimated net EBITDA of $171,129,000 ($230,000,000 - $58,871,000 = $171,129,000). Application of the 20% capitalization rate to the adjusted EBITDA resulted in an estimate of true market value of $855,645,000 for tax year 2009 ($171,129,000 + .20 = $855,645,000).
With respect to tax year 2010, plaintiffs first expert applied the 5% and 6% to both the actual gross revenue for 2008, and actual gross revenue for the first nine months of 2009. He reconciled these figures to arrive at an estimated fee of $55,000,000. Because it is the expert’s experience that management companies pay the salaries of the top manager and two assistants under the top manager, he deducted from his estimated management fee $1,743,914 that the Borgata paid to its top manager and two *494 assistants. This resulted in an estimated management fee of $53,256,000 to deduct for business value, leaving an estimated net EBITDA of $159,744,000 ($213,000,000 - $53,256,000 = $159,744,000). Application of the 20% capitalization rate to the adjusted EBITDA resulted in an estimate of trae market value of $798,720,000 for tax year 2010 ($159,744,000 -h .20 = $798,720,000).
From these figures plaintiffs first appraisal expert deducted the value of personal property that would be sold along with the subject real property. For tax year 2009, the expert used actual costs of personal property, as reported by the taxpayer, of $225,000,000. To this amount he attributed $34,500,000 in soft costs and financing charges (15% of the total soft costs and financing charges for the entire facility). He opined a total cost for the personal property new at $259,500,000 ($225,000,000 + $34,500,000 = $259,500,000). He thereafter estimated a 50% depreciation rate, given the rapidity at which personal property loses value because of physical wear and functional and external obsolescence. This indicates an estimated personal property value of $129,750,000 ($259,500,000 x .50 = $129,750,000).
After deducting the value of the personal property, plaintiffs first appraisal expert concluded a true market value of the subject property — land and improvements only — of $725,895,000 for tax year 2009 ($855,645,000 - $129,750,000 = $725,895,000).
For tax year 2010, the expert used actual costs of personal property, as reported by the taxpayer, of $225,000,000. To this amount he attributed $34,500,000 in soft costs and financing charges (15% of the total soft costs and financing charges for the entire facility). He opined a total cost for the personal property new at $259,500,000 ($225,000,000 + $34,500,000 = $259,500,000). He thereafter estimated a 50% depreciation rate, given the rapidity at which personal property loses value because of physical wear and functional and external obsolescence. This indicates an estimated personal property value of $129,750,000 ($259,500,000 x .50 = $129,750,000).
After deducting the value of the personal property, plaintiffs first appraisal expert concluded a true market value of the subject *495 property — land and improvements only — of $668,970,000 for tax year 2010 ($798,720,000 - $129,750,000 = $668,970,000).
The expert made a final adjustment to his value conclusions. He observed that the court’s adoption of his opinion of value would reduce plaintiffs taxes for each tax year. With respect to tax year 2009, plaintiff would benefit from a reduction of $25,326,155 in local property taxes. Because this reduction would reduce plaintiffs expenses by that amount, it is necessary for the expert to adjust his net EBITDA. This would add $126,630,775 in value to the subject property ($25,326,155 -f- .20 = $126,630,775). This results in a final opinion of value of the subject property — land and improvements only — of $852,526,000 for tax year 2009 ($725,-895,000 + $126,630,775 = $852,525,775).
With respect to tax year 2010, plaintiff would benefit from a reduction of $27,295,307 in local property taxes. Because this reduction would reduce plaintiffs expenses by that amount, it is necessary for the expert to adjust his net EBITDA. This would add $136,477,000 in value to the subject property ($27,295,307 .20 = $136,476,535). This results in a final opinion of value of the subject property — land and improvements only — of $805,447,000 for tax year 2010 ($668,970,000 4- $136,477,000 = $805,477,000).[4]
2. Plaintiffs Second Appraisal Expert.
Plaintiffs second appraisal expert is an appraiser and consultant. At the time of trial, she had been an appraiser for 35 years. *496 She has appraised several hundred casino-hotels, including at least five in Atlantic City. She is a frequent author of articles on valuation in the hotel and gaming industry and has published a chapter concerning hotel investments for a book on hotel valuation. Over defendant’s objection, she was recognized by the court as an expert in real estate appraisal and casino-hotel appraisal.
Plaintiff’s second appraisal expert took the income approach to determine the value of the subject property. She testified that it is her experience that participants in the casino-hotel marketplace determine the value of such properties by studying the trailing twelve months of EBITDA, as well as the demand and supply in the marketplace, and projecting income during a reasonable holding period. According to the expert, market participants apply an EBITDA multiple to determine a sales price and the marketplace does not determine sales prices for casino-hotels based on cost. In addition, it is her opinion that 99.5% or 99.9% of sales in the casino-hotel industry involve the sale of all assets — real property, personal property and the ongoing business enterprise. The real property is not sold separately, as its highest and best use is to generate income from gaming and hotel room rentals.
When determining projected revenues for the subject property, the expert considered gaming revenue and hotel room revenue separately. She began her analysis with a review of gaming revenue at all operating casino-hotels in Atlantic City during the period 2005 to October 1, 2008, the first valuation date. For slot machine income the industry realized a 3.5% increase from 2005 to 2006. From 2006 to 2007 — after the start of economic recession and the inti’oduction of slot machines in Pennsylvania — the Atlantic City casinos experienced a roughly 9% decline in slot machine revenue. In the twelve months leading to October 1, 2008, Atlantic City casinos experienced an additional 6.3% decline in slot machine revenue.
There was less erosion in table game revenue during that period. The expert attributed this to the fact that Pennsylvania casinos did not offer table games in the period leading to October 1, 2008. Table game revenue at Atlantic City casinos rose from *497 2005 to 2006 by 4.7% and rose an additional 2.7% from 2006 to 2007. However, table game revenue dropped 1.3% in the twelve months leading to October 1, 2008.
According to the credible testimony of plaintiffs second appraisal expert, from the period 2005 through 2007, the Borgata was on almost a stabilized operating trend with increasing revenue. During 2007, the Borgata experienced an increase in expenses associated with promotions to attract customers, a sign that regional gaming competition had increased. As the gaming environment became more competitive, the need to offer incentives — e.g., free rooms, fee show tickets, free slot play — increased. In the twelve months leading to October 1, 2008, the Borgata experienced a slight uptick in revenues. While there was a decline in gaming revenue during this period, overall revenue rose, likely because of the opening of the Water Club Tower in June 2008. The expert offered the opinion that the slight increase in revenue was actually a negative indicator for the subject property, given that the opening of a 700-plus room hotel and spa during the peak summer season should have generated a much more significant boost in revenue than was realized by the Borgata.
In addition, after examining historic data regarding supply and demand, plaintiffs second appraisal expert concluded that as of the first valuation date, the Atlantic City gaming and hotel markets were oversupplied and intensely competitive. She projected that participants in the market on that date would forecast increased competition for a reasonable holding period, given the decline of the Atlantic City market and the rise in regional gaming opportunities.
After a detailed study of revenue statistics, supply levels, and attainable market penetration rates, plaintiffs second appraisal expert predicted that as of October 1, 2008, the Borgata’s gaming revenue would decline by 1.2% for 2008, 6.3% for 2009 and 3.7% in 2010, reflecting primarily the impact of the national economic downturn and new regional gaming competition. She predicted modest increases in gaming revenue at the Borgata beginning in 2011.
*498 With respect to hotel room revenue, the expert examined first the Atlantic City casino-hotel market. She noted that during 2008, the Borgata, Harrah’s and Trump Taj Mahal each added a hotel tower. Harrah’s added 960 hotel rooms and the Trump Taj Mahal added 720 hotel rooms. At the end of 2008, Atlantic City casino-hotels had a supply of 17,059 hotel rooms. In the decade prior to the opening of new hotel towers, Atlantic City casino-hotels consistently achieved occupancy levels of more than 90%.
Beginning in 2008, Atlantic City hotel room supply began to outpace demand, due to the growth in regional gaming in Pennsylvania. As a result, hotel room occupancy rates began to decline. In addition, the “RevPAR,” or revenue per available room, began to decline for Atlantic City casino-hotels beginning in 2007. For the period ending September 2008, yearly RevPAR at casino-hotels dropped 8.3% due to declines in both occupancy and average room rates. RevPAR continued to decline through 2009 due to the economic recession and increased local and regional competition. These trends were exacerbated by the fact that average room rates at casino-hotels are driven downward by offers of discounted and free hotel rooms to casino customers in order to promote gaming revenue. Atlantic City casino-hotels, including the Borgata, increased promotional offers effecting hotel room rates in response to increased competition in order to preserve market share.
During the relevant periods the Borgata was the market leader in Atlantic City in both hotel room occupancy and average room rate. Occupancy and average rates at the Borgata peaked in 2007, before the opening of the Water Club Tower. In the period ending September 2008, occupancy declined approximately 6% and RevPAR declined 6.3%. These declines continued through 2009. The expert attributed the declines to oversupply in the market, increased local and regional competition, and the economic recession.
The expert concluded that the Borgata, given its position as a market leader in Atlantic City, will likely achieve relatively high hotel room occupancy levels during a reasonable holding period *499 for the subject property. The expert opined an occupancy level of 88% in 2008 and 82% in 2009. She further opined the subject property maintaining an occupancy level in the mid 80% to 90% range in the following years. Average daily room rates, she opined, will decrease through 2011 and stabilize in 2012, increasing at an assumed 2% rate of inflation.
The expert also compared the Borgata’s budgeted income for 2008 with its actual income and noted that revenues did not meet budgeted levels. While the opening of the Water Club Tower in 2008 was expected to increase revenue significantly, only marginal gains were realized. Actual gaming revenue dropped, while other categories rose slightly due to the opening of the new hotel tower. Actual revenue achieved in 2008 was only 90% of budget, and actual house profit was only 74% of the budgeted amount. Promotional allowances, departmental expenses, and undistributed expenses increased in response to heightened competition.
The Borgata increased its profitability in 2009 versus 2008, even though revenue fell approximately 1.2% short of the budgeted amount. This was due, in the expert’s opinion, to the implementation of extreme cost reductions due to good management in the face of tightening economic and competitive conditions. As noted above, austerity measures in 2009 included the mid-week closure of the Water Club Tower in the off-season and cost controls resulting in significant reductions in administrative and general expenses.
After a detailed analysis of every major category of income and expenses at the subject property, plaintiffs second appraisal expert estimated EBITDA for tax year 2009 of $229,677,000. This amount does not include real estate taxes, given that the purpose of the expert’s formulation of an opinion of value is to determine the amount of real estate taxes due on the subject property. The expert accounted for real estate taxes later in her analysis. Nor does this amount reflect a large insurance payment received by plaintiff as the result of a major fire at the Water Club Tower during construction. Receipt of that payment represented an *500 extraordinary event not likely to recur during a reasonable holding period.
Plaintiffs second appraisal expert thereafter extracted the value of the business enterprise by applying a hypothetical management fee. As explained above, the fee theoretically represents what a casino-hotel owner would pay to an outside entity to operate the facility. By placing the property owner in the position of a passive investor, the business value of the casino-hotel operation is extracted from the ultimate conclusion of value. She opined a theoretical management fee of 4% of net revenue. She reached this figure through analysis of management contracts in place at gaming facilities owned by Native American tribes, which are frequently the subject of management agreements with third parties with gaming expertise, as well as other casino management arrangements of which she was aware. She found no management fees in place at Atlantic City casino-hotels on the valuation dates. After adjustment for the management fee, the expert offered an opinion of EBITDA of $197,381,000 for tax year 2009.
The expert then applied a 2% of net revenue annual reserve for the replacement of furniture, fixtures, equipment and other personal property essential to the operation of a casino-hotel. This includes all non-real estate items that normally are capitalized and not expensed, such as slot machines, upholstered slot chairs, surveillance equipment, change carts, table games and hotel room furnishings. Personal property at casino-hotels is subject to heavy use and must be replaced periodically. After adjustment for this factor, the expert offered an opinion of EBITDA of $181,233,000 for tax year 2009.
Plaintiff’s second appraisal expert then formulated an EBITDA multiple. She looked at EBITDA multiples derived from actual sales of gaming facilities and the EBITDA multiples developed by investment banking firms that study the gaming industry. The expert credibly testified that identifying the appropriate EBITDA multiple was a challenge because very few casino-hotels sold near the relevant valuation dates as a result of credit markets tightening during the beginnings of the national economic crisis in 2008. *501 In addition, the sale of the Tropieana Atlantic City casino-hotel in March 2009 was given little weight because it arose from a bankruptcy. The sale of the Amelia Belle, a riverboat in Louisiana, in June 2009 was also given little weight because of its age and location in a secondary market.
In the expert’s opinion, the sale of the Treasure Island hotel-casino in Las Vegas, discussed at greater length above, was the one institutional grade transaction to take place during this period. The expert determined this sale to be the most relevant transaction, as it reflected the price paid for a first-class casino-hotel in a major gaming market. She was of the opinion that the sales price for that property was reached in mid-2008 and announced to the public in December 2008. The transaction closed in March 2009. The expert determined that the EBITDA for the Treasure Island casino-hotel for the twelve months ending December 2008, the announcement date of the transaction, was approximately $100 million. Dividing the $755 million purchase price by 100 million resulted in this expert’s opinion in an EBITDA multiple of 7.55.[5]
The expert also examined EBITDA multiples of major gaming companies. The multiples were derived by an investment bank as of the end of the third quarter of 2008 by dividing each company’s total enterprise value by its reported EBITDA. She noted that EBITDA multiples declined since 2006, as gaming stocks suffered in the wake of the national economic downturn. These multiples fell in a broad range from 6.01 to 15.12. The higher end multiples were for companies with considerable existing and proposed investments in Macau and Asia, gaming markets that are much more vibrant than those in the United States. The two gaming companies with a 50% interest in the Borgata, MGM Mirage and Boyd Gaming, had EBITDA multiples of 7.39 and 7.32. These multiples are higher than would be the case for a stand-alone *502 casino-hotel in Atlantic City, as they reflect the diversified gaming assets of MGM Mirage and Boyd Gaming, domestically and internationally, and their associated growth prospects.
Given the growing regional competition applying downward economic pressure on the Atlantic City market, Borgata’s reliance on customers from the region in which gaming was expanding, and the national economic downturn, the expert concluded a EBITDA multiple of 6 for the subject property. According to the expert, this multiple also reflects the risk of owning a single asset and the generally unfavorable investment climate in Atlantic City as of October 1,2008.
The EBITDA multiple was thereafter adjusted by the expert to reflect the effective tax rate if her conclusion of value were to be accepted by the court. This adjustment was based on a mathematical calculation including the Atlantic City tax rate for 2009, the equalization rate and the ratio of real to personal property she opined for the property. The expert’s adjusted EBITDA multiple of 5.52 effectively builds the local property tax burden into the valuation calculation.
Applying the adjusted EBITDA multiple to the first year’s projected net income (after deduction for reserve for replacement of personal property and the value of the business component), resulted in a value of $1,001,000,000 ($181,233,262 x 5.52 = $1,001,010,409).[6] This converts to an overall capitalization rate of 16.7%. The expert considered this rate to be appropriate given the projected long-term decline in the Borgata’s net income and because of the significant risk due to increasing regional competition.
The expert also used a discounted cash flow analysis to estimate the value of the subject property. Her discounted cash flow *503 analysis resulted in a value of $1,014,000,000. She reconciled the two values at $1,010,000,000.
The expert deducted from this figure the depreciated value of the furniture, fixtures and equipment that would be sold with the subject property. She began her analysis with the actual cost of the personal property and a pro-rata share of soft costs associated with the personal property. She estimated the total amount to be $259,431,000. She then deducted depreciation from the value of the personal property. She theorized that once a casino is operating for a period of time, its personal property is in a continuous state of refurbishment and replenishment, in light of the heavy use of personal property in a casino-hotel. She opined that at any given time, there are items of personal property near the end of their usefulness which have very little value and other items of personal property that were recently replaced and near full value. This is particularly true with respect to the subject property, where, on the valuation dates, the personal property in the Water Club Tower was relatively new and the personal property in the original Borgata was approaching the ten-year mark, a point at which, the expert opined, hotel personal property reaches the end of its usefulness. The expert opined that depreciation at midpoint, or 50%, would be appropriate to account for this state of affairs. At 50% depreciation, the value of the furniture, fixtures and equipment is $130,000,000.
The expert also considered working capital on hand at the Borgata on October 1, 2008. Cash, cash equivalents, accounts receivable, inventories, investments, advances and receivables are included in this category. From working capital was deducted accounts payable, income taxes payable and other accrued expenses and liabilities. Because liabilities exceeded working capital by $34,608,000, no deduction was made for this category.
By deducting the $130,000,000 value of the personal property from the $1,010,000,000 reconciled value for the entire property, the expert arrived at an opinion that the real property had a true market value of $880,000,000 as of October 1, 2008 ($1,010,000,-000 - $130,000,000 = $880,000,000).
*504 Plaintiff’s second appraiser applied the same analysis under the income approach when reaching an opinion of value of the subject property as of October 1, 2009, the second valuation date. According to the expert, as of that date, the economic outlook for the Atlantic City gaming industry continued to be grim. The legislation authorizing table games in Pennsylvania casinos appeared more certain to be enacted. The Sands casino opened in Bethlehem, Pennsylvania in May 2009, providing a convenient gaming option for customers in northern New Jersey and New York City. A $650 million casino with 3,000 slot machines had been approved for the Philadelphia waterfront with a planned opening date of October 2009. Pennsylvania’s slot-machine casinos had begun installing “electronic table games,” slot machines designed to act like table games with an electronic dealer. These machines had been growing in popularity, further cutting into the Atlantic City market.
In addition, by October 1, 2009, the bidding process was underway to operate the Aqueduct racetrack casino in Queens with 4,500 video lottery terminals. New York City is a major source of customers to the Atlantic City casino-hotel market. In Maryland, approvals were issued for that state’s first gaming facility at Ocean Downs Racetrack. In Delaware, the legislature was considering a bill to authorize live table games and sports betting. Delaware is one of four states in which sports betting is not banned by federal law.
Atlantic City visitor statistics showed a 4.5% decline in visits from 2008 to 2009. Other Atlantic City casino-hotels were in bankruptcy and by 2009 every plan for major development of gaming resorts in the city had all been halted. In addition, as noted above, management of the subject property decided to close the Water Club Tower mid-week on a seasonal basis. Although by all accounts this decision is reflective of the good management in place at the Borgata, it is also evidence of the continued downward economic trend the facility was experiencing.
Plaintiffs second appraisal expert opined that the Atlantic City gaming market remained oversupplied and intensely competitive *505 as of October 1, 2009. She projected increased competition and a dilution of the Atlantic City market. The expert opined that in late 2009 it was evident that “the Atlantic City gaming market was in a steep decline.” Thus, even though the Borgata remained a market leader in Atlantic City and might even experience an increase in market share as compared to other Atlantic City casino-hotels, it will only garner a bigger percentage of an increasingly shrinking pie.
After a detailed analysis of every major category of income and expenses, plaintiffs second appraisal expert estimated EBITDA for tax year 2010 of $219,976,000. The expert thereafter extracted the value of the business enterprise by applying a hypothetical management fee. She used the same rate (4% of net revenue) that she used for tax year 2009. After application of that rate, the expert offered an opinion of EBITDA of $189,764,000 for tax year 2010. The expert then applied a 2% of net revenue annual reserve to account for the replacement of furniture, fixtures, equipment and other personal property. After this adjustment the expert offered an opinion of EBITDA of $174,658,000 for tax year 2010.
Plaintiffs second appraisal expert opined a slightly higher EBITDA multiple — 6.25—for tax year 2010. In addition to the sales she relied upon with when calculating an EBITDA multiple for tax year 2009, the expert considered the April 2010 sales of the Rainbow Casino in Vicksburg, Mississippi. That facility is a docked riverboat casino, along with a land-based 89-room hotel and 20,000 square feet of meeting space. The sale had an EBITDA multiple of 7.3. The facility is of a lower quality than the subject property. The expert, however, found the EBITDA multiple to be useful information because it reflected the value the market placed on income earning potential. Again, the expert relied most heavily on the sale of the Treasure Island casino-hotel in Las Vegas. In addition, the EBITDA multiples of companies with assets most comparable to the subject property ranged from 7.58 to 9.81.
The expert’s EBITDA multiple for tax year 2010 was thereafter adjusted by the expert to reflect the effective tax rate if her *506 conclusion of value were to be accepted by the court. This adjustment was based on a mathematical calculation concerning the Atlantic City tax rate for 2010, the equalization rate and the ratio of real to personal property she opined for the property. The adjusted EBITDA multiple of 5.71 builds the property tax burden into the valuation calculation.
Applying the adjusted EBITDA multiple to the first year’s projected net income (after deduction for reserve for replacement of personal property and the value of the business component), resulted in a value of $997,000,000 ($174,658,414 x 5.71 = $997,018,740). This converts to a capitalization rate of 16.0%. The expert considered this capitalization rate to be appropriate given the projected decline in the Borgata’s net income over a holding period.
The expert also used a discounted cash flow analysis to estimate the value of the subject property. Her discounted cash flow analysis resulted in a value of $1,047,000,000. She reconciled the two values at $1,000,000,000.
The expert then deducted the depreciated value of the furniture, fixtures and equipment that would be sold with the subject property. Using actual cost figures and the mid-point depreciation rate discussed above, the expert deducted $130,000,000 for the value of personal property. No deduction was made for working capital on hand as of October 1, 2009, because the amount of that asset was minimal (0.2%) compared to the overall value of the property.
By deducting the $130,000,000 value of the personal property from the $1,000,000,000 reconciled value, the expert arrived at an opinion that the real property had a true market value of $870,000,000 as of October 1,2009 ($1,000,000,000 - $130,000,000 = $870,000,000).
Plaintiff’s second appraisal expert also formulated an opinion of value of the subject property under the cost approach. She was of the opinion that the cost approach is not reliable when determining the value of a casino-hotel and is not used in the marketplace. She opined that the investment in constructing a casino-hotel may *507 well exceed its income generating capacity. Conversely, the cost of constructing a casino-hotel, for example in a captive market, may be far less than the value attributable to the property’s projected ability to generate income. The expert’s initial report did not include the cost approach, given her views about its inapplicability in valuing a casino-hotel. She undertook a cost approach analysis only at the direction of plaintiffs counsel, who was concerned about this court’s apparent dissatisfaction with not being presented with expert testimony based on the cost approach in City of Atlantic City v. Ace Gaming, LLC, 23 N.J.Tax 70 (Tax 2006), the only published opinion in New Jersey in which the true market value of a casino-hotel was determined for local property tax purposes.
The expert identified multiple difficulties with the cost approach, including the challenge in measuring accurately the cost to replace a large, complex casino-hotel. Perhaps more challenging is the accurate estimation of depreciation, which can be attributed to three factors, physical depreciation, functional obsolescence and economic (or external) obsolescence. In order to determine external or functional obsolescence, plaintiffs second appraisal expert relied on the reports of two other experts, an economics professor with expertise in determining economic obsolescence of commercial assets, and a casino gaming industry analyst. The analyst, whose opinion was also relied on by the economics professor in his analysis, offered an opinion on the utilization of the Borgata before and after the Water Tower Club expansion. Because the court does not rely on the cost approach to determine the value of the subject property, this approach, which was explored at length at trial, will not be detailed in this opinion.
Plaintiffs second appraisal expert did not use the sales comparison approach. She was of the opinion that participants in the marketplace do not value casino-hotels using the sales comparison approach. In addition, because each casino-hotel property has unique characteristics it would not be possible to identify reliable units of comparison in order to make adjustments to sales prices. She was of the opinion that the comparable sales approach would necessarily involve several speculative and unsupportable adjust *508 ments. She noted, however, that comparable sales are used by the casino-hotel industry to determine an EBITDA multiple for a property being valued, given that a property’s ability to generate income is the sole measure of comparison used in the casino-hotel industry when determining value.
3. Plaintiff’s EBITDA Múltipla!Capitalization Rate Expert.
Plaintiff also offered the testimony of an expert casino industry analyst with respect to the appropriate EBITDA multiple to be applied when determining the true market value of the subject property. This expert, who also provided the utilization report relied on by plaintiffs second appraisal expert in her cost approach analysis, corroborated the opinion that in the marketplace the purchase price of a casino-hotel is determined by applying an EBITDA multiple to the trailing twelve months of EBITDA and not through the cost or comparable sales approaches.
This expert opined that the proliferation of regional gaming opportunities had a significant negative impact on casino-hotel revenue in Atlantic City. He also opined that the national economic crisis in late 2008 had a detrimental effect on gaming revenue and future earning potential for Atlantic City casino-hotels. The negative impact, according to the expert, came not only from customers deciding to frequent competing gaming facilities, but also from increased marketing costs to attract customers and increased labor costs associated with competitors attracting talented employees. According to the expert, all of these factors placed downward pressure on EBITDA multiples for the Atlantic City casino-hotel market.
This expert opined that the appropriate EBITDA multiple for the subject property as of October 1, 2008 was 5.4. The equivalent capitalization rate would be 18.6%, not adjusted to consider the tax rate were the value of the subject property to be reduced. He reached this figure through an analysis of the EBITDA multiples of publically traded gaming companies and gaming facility sales. One sale he considered was the purchase of the Treasure Island casino-hotel in Las Vegas. He concluded that the *509 EBITDA for that sale was 6.9. To make this determination he used the trailing twelve months EBITDA at the time of the closing in March 2009. The expert opined that the correct EBITDA multiple for the subject was less than the Treasure Island EBITDA multiple because the subject property is not in the prime Las Vegas strip location of the Treasure Island and because of the significant increase in regional competition facing Atlantic City casino-hotels as of October 1, 2008, as well as the implementation of the municipal smoking ban.
With respect to tax year 2010, the expert opined an EBITDA multiple of 5.5. This converts to a capitalization rate of 18.3% without consideration of the tax burden if the value of the subject property is reduced. This EBITDA multiple was based on, in the expert’s view, the worsening national economy, increased regional competition, and dimmed earning prospects for the Borgata as of October 1,2009.
4. Defendant’s Appraisal Expert.
Defendant presented the testimony of an expert real estate appraiser with experience valuing casino-hotels in Atlantic City. A longtime consultant to Atlantic City, as of the valuation date, the expert had appraised each of the twelve casino-hotels operating in Atlantic City. This expert took both the income approach and the cost approach to formulate an opinion of the true market value of the subject property. She did not use the comparable sales approach, given the lack of arms’ length transactions involving casino-hotels in Atlantic City.
Defendant’s expert began her income approach analysis with an examination of the Borgata’s actual revenues and expenses for the years 2006 through 2009, as well as the performance of all other Atlantic City casino-hotels during that period. The expert acknowledged an overall decline in revenue for the Atlantic City casino-hotel industry from 2006 to 2009. While the Borgata and the other casino-hotels the expert considered to be top-tier facilities experienced declines in revenue during that period, they generally performed better than other Atlantic City casino-hotels. *510 The Borgata had what could accurately be described as “the least worst” performance among Atlantic City casino-hotels, experiencing less sharp declines than its competitors and leading the pack in what was clearly a beleaguered industry.
From 2006 to 2007 the Borgata’s declines in revenue were significantly less severe than experienced in 2008 and 2009. The more severe decreases in the later years resulted from both drops in gaming revenue and hotel room revenue. The expert summarized her findings as follows “the casino income components, in general, began to decline in 2007 for most casinos. The casinos with gaming floor area in excess of 100,000 square feet weathered the economic downturn slightly better than the small, older casinos. By 2009, all casinos in Atlantic City were feeling the [e]ffeets of the economy and reported negative growth rates in almost all revenue components.”
She attributed the declines to the negative effect of the downturn in the national and local economy and the Atlantic City partial smoking ban. She did not consider the expansion of gaming in the States surrounding New Jersey to have had a significant impact on the value of the subject property on the relevant valuation dates. According to the expert, the potential impact of Pennsylvania slot-machine casinos was unknown as of October 1, 2008 and October 1, 2009. She is of the opinion that with the benefit of hindsight we can see the detrimental effect of competition, but participants in the marketplace would not have known of that impact on the valuation dates. She admitted, however, that she “never studied” the question of how many Atlantic City casino-hotel customers came from Pennsylvania during the relevant periods. She did not, therefore, consider declines in visits from out-of-State customers when reaching her opinion with respect to the impact of gaming expansion on Atlantic City revenue. The expert also gave vague testimony that market participants in 2008 and 2009 suspected that Pennsylvania gaming would not be successful because of a “high tax rate” on revenues from slot machines. No evidence explaining this testimony was introduced at trial.
*511 The expert viewed the Atlantic City casino-hotel market to be in a transitional period on the two valuation dates. She did not consider the significant decline in revenue to be evidence of a long-term change in the Atlantic City casino-hotel market. Rather, she viewed the negative revenue figures to represent lean years in what is a cyclical industry. She therefore stabilized income for the subject property “not in the highs, not at the lows, somewhere that’s in the middle that represents a place where the property may stay for a while.” She explained that she was “going to try to find the middle ground.” She described her analysis of the Borgata’s income data from 2006 to 2009 as follows: “I looked at two highs and two lows and I took what would be called an average or equal weight.” With respect to gaming revenue, her report states that “we feel the best stabilization of the gaming revenue is the average of four years including the two years under appeal (2006 through 2009).” She took the same approach with other categories of revenue, including hotel room revenue.
The expert estimated gross revenues of $1,045,563,000 for both October 1, 2008 and October 1, 2009. The expert explained that because she stabilized income by averaging four years of actual data it was not necessary for her to arrive at a separate estimate of gross revenue for each tax year.
The expert also used the four-year averaging approach to estimate the cost of promotional allowances and other expenses. After deduction for the promotion allowances and expenses calculated through averaging, the expert estimated gross operating profits of $235,879,000 for both tax years. Real estate taxes actually assessed against the subject property for the two tax years at issue were added back to the equation by the expert to bring gross operating expenses of $274,444,630 for tax year 2009 and $276,613,629 for tax year 2010.
Defendant’s expert candidly acknowledged that she considered 2009 income and expenses when determining the value of the Borgata for tax years 2008 and 2009. Participants in the marketplace, however, would not have had data from 2009 when negotiating a purchase price for the subject property on October 1, 2008. *512 Similarly, the expert acknowledged that she considered a full year of 2009 income and expense data when determining value as of October 1, 2009, even though market participants would not have had that information as of that valuation date. According to the expert’s testimony at trial, “I know the Courts don’t like me going to post-trial — post-valuation dates, but I felt in this instance I had to. I wouldn’t normally do it. If there was other things that I thought would have been better, I would have done it. Maybe the Court doesn’t agree and that’s fine. I do believe I took the right approach by looking at those four years. I think I tried to do the best I could for the City and for the property owner to try to find that middle ground. And to me, that’s what stabilization is.” She justified looking at 2009 income and expense data because there were extraordinary expenses associated with the opening of the Water Club Tower and there was not a full year of income and expenses from the Water Club Tower and because the Borgata and the Atlantic City casino-hotel market were undergoing change on the valuation dates.
Defendant’s expert made no deduction from her estimate of gross operating income for a hypothetical management fee to remove the value of the business enterprise. Although the expert generally was in agreement that it is appropriate under the income approach to extract business value through the application of a hypothetical management fee, she determined that no fee was warranted in this case. The expert’s rationale for this conclusion is her opinion that the Borgata already has high level managers in place and the deduction of a management fee would be “double counting” and would artificially reduce the value of the subject property. She could not, however, identify with precision the amount that the Borgata paid during the relevant periods to its high-level managers. The expert testified that she was unable to identify the salaries and other compensation paid to the individuals she considered to be high-level managers who were the equivalent of a management team that would be provided through a management agreement. She could not, therefore, offer an opinion of whether the salaries and compensation paid by the Borgata represented a market rate for a management agreement.
*513 The expert made an adjustment for the return of short-lived personal property, primarily furniture, fixture and equipment. After an examination of actual costs incurred by the Borgata in replacing furniture and estimates on the useful life of various categories of property, the expert estimated a reserve for the replacement of personal property of $24,300,000 for each tax year.
Finally, defendant’s expert considered other income and expenses associated with the operation of the Borgata. The expert examined interest income from operations, a return on the cash required to be kept on premises in the casino cage, and payments to the Casino Reinvestment Development Authority. Her calculation resulted in a net deduction of $9,435,000 for each tax year.
The expert arrived at an overall net operating income of $240,709,630 for tax year 2009 and $242,878,629 for tax year 2010.
Defendant’s expert began her capitalization rate analysis with an examination of studies by PriceWaterhouse Coopers, LLC Korpaez, a well-known financial analysis firm. The Korpaez studies on which the expert relied are based on surveys completed by investors who took part in real estate transactions. The surveys concern equity yield and equity capitalization rates. Korpaez does not conduct studies of the casino-hotel industry. Defendant’s expert relied, instead, on Korpaez studies concerning full-service and luxury hotels not associated with casinos. The expert made a 10% adjustment to the hotel data from the third quarter of 2008 and first quarter of 2009 to account for a decline in casino wins at the Borgata, resulting in overall capitalization rates ranging from 9.35% to 9.50%. The expert also undertook a band of investment analysis, resulting in an 8% capitalization rate. Finally, defendant’s expert examined the Borgata’s financing for its long-term debt, revolving loans and other outstanding loans. From this examination the expert derived a capitalization rate ranging from 4.8% to 7.2%.
After weighing the above-described data, defendant’s expert concluded that “[bjased on the size of the Borgata, its location and position in the market, an 8.0% capitalization rate is deemed appropriate.” The expert adjusted the 8.0% capitalization rate to *514 account for real estate taxes, which were excluded as an expense. Using the tax rates in place in Atlantic City during the relevant tax years, the expert concluded the capitalization rates of 9.713% for tax year 2009 and 9.809% for tax year 2010.
The expert also calculated a deduction to extract from her calculations the value of personal property that would be purchased along with real property in a hypothetical sale of the Borgata. Relying on the depreciated book value of the personal property, the expert deducted $105,667,729 for personal property for tax year 2009 and $81,971,623 for tax year 2010.
Application of the expert’s net operating income, capitalization rates and personal property deduction resulted in opinions of true market value as follows:
Tax year 2009 $2,373,000,000 ($240,709,630 .09713 = $2,478,-221,250 - $105,667,729 = $2,372,553,521).
Tax year 2010 $2,394,000,000 ($242,878,629 h- .09809 = $2,476,-079,407 - $81,971,623 = $2,394,107,784).
Defendant’s expert also used the cost approach to formulate an opinion of value for the subject property. Because the court concludes that the income approach is the most credible method for determining the true market value of the subject property, the court will not discuss the expert’s cost approach analysis at length. It is important to note, however, that defendant’s expert made no adjustment to her estimated depreciated cost new for economic obsolescence. She made the determination not to make an economic obsolescence adjustment based on her conclusion that the value she reached under the income approach exceeded the cost new of the subject property. She opined that this comparison supports the conclusion that the subject property is not subject to economic obsolescence. She ultimately concluded, under the cost approach, values of $2,200,000,000 for tax year 2009 and $2,019,000,000 for tax year 2010.
Defendant’s expert gave slightly greater weight to the value she reached using the income approach because, in her words, “technically casinos are bought on their income. It’s considered — sup *515 posedly considered the better approach. So, I considered that the better of the two approaches____” She offered the opinion that the true market value of the subject property on each of the valuation dates was $2,300,000,000. She did not differentiate between the two tax years in her final conclusion of value.
The value opinions of the three appraisal experts can be summarized as follows:
[[Image here]]
III. Conclusions of Law

A. The Presumption of Validity.

The court’s analysis begins with the familiar maxim that “[ojriginal assessments ... are entitled to a presumption of validity.” MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J.Tax 364, 373 (Tax 1998). As Judge Kuskin explained, our Supreme Court has defined the parameters of the presumption as follows:
The presumption attaches to the quantum of the tax assessment. Based on this presumption the appealing taxpayer has the burden of proving that the assessment is erroneous. The presumption in favor of the taxing authority can be rebutted only by cogent evidence, a proposition that has long been settled. The strength of the presumption is exemplified by the nature of the evidence that is required to overcome it. That evidence must be “definite, positive and certain in quality and quantity to overcome the presumption.”
Ibid, (quoting Pantasote Co. v. City of Passaic, 100 N.J. 408, 413, 495 A.2d 1308 (1985) (citations omitted)).
The presumption of correctness arises from the view “that in tax matters it is to be presumed that governmental authority has been exercised correctly and in accordance with law.” Pantasote, supra, 100 N.J. at 413, 495 A.2d 1308 (citing Powder Mill, I Assocs. v. Township of Hamilton, 3 N.J.Tax 439 (Tax 1981)); see also Byram Twp. v. Western World, Inc., 111 N.J. 222, 544 A.2d 37 (1988). The presumption remains “in place even if the municipality utilized a flawed valuation methodology, so long as the quantum of the assessment is not so far removed from *516 the trae value of the property or the method of assessment itself is so patently defective as to justify removal of the presumption of validity.” Transcontinental Gas Pipe Line Corp. v. Township of Bernards, 111 N.J. 507, 517, 545 A.2d 746 (1988) (citation omitted).
“In the absence of a R. 4:37-2(b) motion ... the presumption of validity remains in the case through the close of all proofs.” MSGW Real Estate Fund, LLC, supra, 18 N.J.Tax at 377. In making the determination of whether the presumption has been overcome, the court should weigh and analyze the evidence “as if a motion for judgment at the close of all the evidence had been made pursuant to R. 4:40-1 (whether or not the defendant or plaintiff actually so moves), employing the evidentiary standard applicable to such a motion.” Ibid. The court must accept as true the proofs of the party challenging the assessment and accord that party all legitimate favorable inferences from that evidence. Id. at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 535, 666 A.2d 146 (1995)). The court is concerned with the existence of the evidence, not its weight. Dolson v. Anastasia, 55 N.J. 2, 5-6, 258 A.2d 706 (1969). In order to overcome the presumption, the evidence “must be ‘sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.’ ” West Colonial Enters., LLC v. City of East Orange, 20 N.J.Tax 576, 579 (Tax 2003)(quoting Lenal Props., Inc. v. City of Jersey City, 18 N.J.Tax 405, 408 (Tax 1999), aff'd, 18 N.J.Tax 658 (App.Div.), certif. denied, 165 N.J. 488, 758 A.2d 647 (2000)).
Only after the presumption is overcome with sufficient evidence at the close of trial must the court “appraise the testimony, make a determination of true value and fix the assessment.” Rodwood Gardens, Inc. v. City of Summit, 188 N.J.Super. 34, 38-39, 455 A.2d 1136 (App.Div.1982) (citations omitted). If the court determines that sufficient evidence to overcome the presumption has not been produced, the assessment shall be affirmed and the court need not proceed to making an independent determination of value. Ford Motor Co. v. Township of Edison, 127 N.J. 290, 312, *517 604 A.2d 580 (1992); Global Terminal & Container Serv. v. City of Jersey City, 15 N.J.Tax 698, 703-04 (App.Div.1996).
Plaintiff has overcome the presumption of validity attached to the assessments under review. Two appraisal experts with extensive experience in appraising casino-hotels were called by plaintiff during its case-in-chief and offered opinions of value more than a billion dollars below the assessments on the subject property on the relevant valuation dates. The opinions are based on reasoned analysis of data of the type typically used by appraisers of casino-hotel properties and the opinions of value offered by the experts were arrived at through recognized appraisal techniques. Giving every positive inference to plaintiff, as is required at this juncture of the analysis, sufficient evidence was adduced at trial to raise a doubt in the court’s mind with respect to the validity of the assessments on the property for tax years 2009 and 2010. The court, as a result, turns to the task of determining the true market value of the subject property on the relevant valuation dates.
B. Approaches to Value.
“There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost.” Brown v. Borough of Glen Rock, 19 N.J.Tax 366, 376 (App.Div.)(citing Appraisal Institute, The A'[ypraisal of Real Estate 81 (11th ed 2006)), certif. denied, 168 N.J. 291, 773 A.2d 1154 (2001). “There is no single determinative approach to the valuation of real property.” 125 Monitor Street, LLC v. City of Jersey City, 21 N.J.Tax 232, 237 (Tax 2004)(citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J.Super. 65, 72, 208 A.2d 153 (App.Div.1965); ITT Continental Baking Co. v. Township of East Brunswick, 1 N.J.Tax 244 (Tax 1980)), aff'd, 23 N.J.Tax 9 (App.Div.2005). “The choice of the predominate approach will depend upon the facts of each case and the reaction of the experts to those facts.” Id. at 238 (citing City of New Brunswick v. Division of Tax Appeals, 39 N.J. 537, 189 A.2d 702 (1963); Pennwalt Corp. v. Township of Holmdel, 4 N.J.Tax 51, 61 (Tax 1982)).
*518 The comparable sales approach “usually provides the primary indication of market value in appraisals of properties that are not usually purchased for their income-producing characteristics.” Appraisal Institute, The Appraisal of Real Estate, 419 (12th ed. 2001). This method of valuation has been defined as “[a] set of procedures in which a value indication is derived by comparing the property being appraised to similar properties that have been sold recently, applying appropriate units of comparison, and making adjustments to the sales prices of the comparables based on the elements of comparison.” Id. at 417.
The income capitalization approach is the preferred method of estimating the value of income producing property. Parkway Village Apartments Co. v. Township of Cranford, 108 N.J. 266, 270, 528 A.2d 922 (1987); Hull Junction Holding Corp. v. Borough of Princeton, 16 N.J.Tax 68, 79 (Tax 1996). “In the income capitalization approach, an appraiser analyzes a property’s capacity to generate future benefits and capitalizes the income into an indication of present value.” Appraisal Institute, The Appraisal of Real Estate 445 (13th ed 2008). This approach generally applies to real property that generates income from the rental of the property, not from the business activities that take place at the property.
Determining the value of real property pursuant to the income approach can be
Effective Gross Income
:_Operating Expenses
Net Operating Income
±_Capitalization Rate
Value of Property
See Spiegel v. Town of Harrison, 19 N.J.Tax 291, 295 (App.Div.2001), aff'g, 18 N.J.Tax 416 (Tax 1999); Appraisal Institute,The Appraisal of Real Estate 466 (13th ed 2008). In addition, where the sale of the subject property will include all *519 assets of a business enterprise closely associated with the subject property it is necessary to extract from the value conclusion the value of personal property, often referred to as furniture, fixtures and equipment, and the value of the business enterprise to arrive at a value of only real property. Chesapeake Hotel, LP v. Township of Saddle Brook, 22 N.J.Tax 525, 526 (Tax 2005).
The cost approach is normally relied on to value special purpose property or unique structures for which there is no market. Borough of Little Ferry v. Vecchiotti, 7 N.J.Tax 389, 407 (Tax 1985); Dworman v. Borough of Tintan Falls, 1 N.J.Tax 445, 452 (Tax 1980), aff'd, 180 N.J.Super. 366, 3 N.J.Tax 1, 434 A.2d 1134 (App.Div.), certif. denied, 88 N.J. 495, 443 A.2d 709 (1981). The cost approach “involves a replication, through the use of widely accepted cost services ... of the cost of the components of the building to be valued, less ... depreciation^].” Gale & Kitson Fredon Golf LLC v. Township of Fredon, 26 N.J.Tax 268, 283 (Tax 2011)(quotations omitted). “A cost approach has two elements — land value and the reproduction or replacement cost of the buildings and other improvements.” International Flavors & Fragrances, Inc. v. Borough of Union Beach, 21 N.J.Tax 403, 417 (Tax 2004). From the estimated reproduction cost is deducted depreciation from all causes. Depreciation is defined as a loss in value from three causes: physical depreciation, functional obsolescence and external economic factors. The cost approach is most effective when the property being valued is new, in light of the difficulties in accurately estimating the various components of depreciation. See Worden-Hoidal Funeral Homes v. Borough of Red Bank, 21 N.J.Tax 336, 338 (Tax 2004).
New Jersey law is not settled with respect to the best approach for determining the true market value of a casino-hotel and related facilities. In Ace Gaming, LLC, supra, the only published opinion in New Jersey in which the true market value of a casino-hotel was determined for local property tax purposes, the court used the income approach to determine value. The court’s decision, however, was reached after the parties stipulated that they would not rely on the cost approach to determine the value in that ease. The parties’ stipulation was not endorsed by the court. *520 Judge Bianco held that “the court cannot and will not accept by stipulation or otherwise, that the cost approach to value is inapplicable in this case or any other tax appeal involving casino hotel property.” 23 N.J.Tax at 97-98. He observed that, given the nature of casino-hotels, the lack of precedent in New Jersey and the existence of published opinions in other states using the cost approach to value casino-hotels, “this court is not certain why counsel would agree not to use the cost approach to value in this matter, and why both expert appraisers would acquiesce in that agreement.” Id. at 99. “With regal’d to the cost approach to value in the present matters, this court is only willing to accept that neither party ultimately opted to utilize that approach.” Id. at 98.
Judge Bianco explained his decision to use the income approach as follows:
It would have been preferable to have had the benefit of all three approaches to value given the novelty of the issue before the court. However, since the court finds the sales comparison approach of Atlantic City’s expert to be insufficient to determine value, and since any determination of value under the cost approach has been denied to the court under agreement of the parties in the present matters, all that remain are the respective income approaches proffered by the experts herein. This court will not substitute its own judgment for theirs. Clearly the more reasonable course is to proceed to a determination of value under the income approach alone, particularly in view of the fact that the court is unable to discern the method by which the original assessment was determined, and since Atlantic City’s expert concluded opinions of value that do not support Atlantic City’s assessment in three of the four years under appeal.
Atlantic City has convinced this court that the best way to proceed is to apply the Rushmore methodology most recently employed in Chesapeake Hotel, L.P., supra, even though it will be the first time known to this court that the methodology will be applied to a casino hotel as opposed to a conventional hotel.
[Id. at 103.]
Also influencing the court’s opinion in Ace Gaming was the unusual status of Atlantic City as the only location of legal gambling in New Jersey. As explained in City of Atlantic City v. Atlantic County Bd. of Taxation, 2 N.J.Tax 30, 43 (Tax 1980), aff'd per curiam, 4 N.J.Tax 685 (App.Div.1982), certif. denied, 93 N.J. 250, 460 A.2d 659 (1983):
Atlantic City is unique. Of all of the 567 municipalities in the state of New Jersey [since reduced to 565], it is the only municipality mentioned by name in the State Constitution. N.J. Const. (1947) Art. IV, § VII, par. 2D. The financial well-being *521 of the city is also of the utmost importance not only to the city itself and to its taxpayers, but to the county, the region and to the entire State.
The valuation of real property in the Atlantic City is complicated by
the nature of the market, the sometimes limited number of sales for comparison purposes and the extraordinary financing arrangements which characterize almost every sale of casino-related property in the city.
[City of Atlantic City v. Ginnetti 17 N.J.Tax, 354, 362 (Tax 1998), aff'd, 18 N.J.Tax 672 (App.Div.2000).]
“This unique nature imposes on litigants, lawyers and on the Tax Court itself, difficult valuations issues. The real estate market in Atlantic City does not necessarily behave in the same manner as real estate markets behave in other localities.” Id. at 360.
It is, however, the court’s obligation to “use the information that has been presented [at trial] by way of facts and expert opinion to fix the assessable values of’ Atlantic City real property before the court. Id. at 361; see also Glen Wall Assocs. v. Township of Wall, 99 N.J. 265, 280, 491 A.2d 1247 (1985). The fact that property is difficult to value does not excuse the court from its obligation to determine value based on a preponderance of the competent evidence adduced by the parties. Ginnetti, supra, 17 N.J.Tax at 360 (citing Hackensack Water Co. v. Borough of Old Tojppan, 77 N.J. 208, 390 A.2d 122(1978); and Cigolini Assocs. v. Borough of Fairview, 208 N.J.Super. 654, 665, 506 A.2d 811 (App.Div.1986)). This court must apply its previously recognized “understanding and sensitivity to the vicissitudes of the unique Atlantic City real estate market and the impact of the casino industry on such market” when applying its “expertise ... in dealing with the complex issues presented here.” City of Atlantic City v. Boardwalk Regency Corp., 19 N.J.Tax 164, 191 (App.Div.2000).
The court concludes that based on the evidence admitted at trial the best approach to determine the value of the subject property in these appeals is the income approach. The primary reason for this conclusion is that the record contains uncontradieted credible evidence from three of plaintiffs experts that buyers, sellers and lenders in the marketplace determine the value of *522 casino-hotels based on the income generating potential of the property. In the marketplace, the parties to casino-hotel transactions begin with a determination of the property’s EBITDA during the most recent trailing twelve-month period. The EBITDA is stabilized and a multiple is applied to determine sales price. The EBITDA multiple reflects the parties’ educated prediction on the future earning potential of the property during a reasonable holding period. The EBITDA multiple can easily be converted to a capitalization rate through an arithmetic formula for purposes of applying the income approach to valuation.
The court acknowledges that, as is the case with most casino-hotels, the majority of the Borgata’s revenue is derived from gaming and not from the rental of hotel rooms. The income approach to valuation has traditionally been applied to real property that generates rental income. Included in that category have been hotels not associated with casinos, which generate the majority of their income from room rentals. New Jersey law, however, does not create inflexible categories of property to which specific approaches to value apply. This court is charged with evaluating the testimony of expert appraisers and determining which, if any, of the approaches to valuing a property presented at trial is credible. Here, all appraisal experts who were presented at trial, including the municipality’s appraisal expert, used the income approach to formulate a value opinion for the subject property. Each expert expressed confidence that he or she had made adequate adjustments to account for the value of personal property and business operations in order to derive an opinion of the value of real property only. The court is satisfied that there is sufficient credible, evidence on which to adopt the value conclusion of one of the appraisal experts under the income approach.
The court also concludes that the cost approach to value is less reliable in this case to determine the true market value of the subject propei’ty on the relevant valuation dates. As plaintiffs two appraisal experts credibly testified, participants in the casino-hotel industxy do not use the cost approach to determine sales price. The court finds credible the experts’ opinions that the quality and characteristics of the physical structure of a casino- *523 hotel are generally not directly indicative of marketplace value. Plaintiffs experts credibly testified that it is not uncommon for the cost of construction of a casino-hotel to exceed market value, particularly where market changes take place during or shortly after the construction of the facility, as is the case here. The Borgata’s two major expansions — the expansion of the casino and the construction of the Water Club Tower hotel — took place shortly before or during significant changes to the regional gaming market detrimental to Atlantic City casino-hotels. By the time the Water Club Tower opened in June 2008, casino gaming was rapidly expanding in the markets that provide a large number of the Borgata’s customers. The fact that the Borgata did not experience a significant gain in revenue from these expansions, and, in fact, realized a loss in revenue shortly after the opening of the new hotel tower, is credible evidence that the amounts invested in constructing those facilities did not correlate to their value.
In addition, the cost approach necessarily requires the difficult task of accurately measuring economic obsolescence. Given that so much of the value of a casino-hotel’s real property is tied to the earning potential of gaming operations, a credible analysis of economic conditions and the translation of those conditions into an appropriate measure of economic obsolescence are essential to reaching a reliable value under the cost approach. This is particularly true here, where the subject property underwent an expensive expansion approved shortly prior to drastic negative changes in the national economy and an expansion in regional competition. The court is not satisfied that, in light of the timing of construction and the changes in the economy and competitive environment, the cost approach would provide a more credible value determination than would the income approach. The court does not hold that the cost approach is inapplicable to the valuation of casino-hotels in New Jersey. It will suffice to hold that based on the record adduced at trial, the income approach is the most reliable method through which to determine the true market value of the subject property on the relevant valuation dates.
The court also concludes that the record contains no credible evidence with which to determine the true market value of the *524 subject property using the comparable sales approach. None of the three appraisal experts used the comparable sales approach to formulate an opinion of value for the subject property. The experts were in agreement that there were no reliable sales of casino-hotels in Atlantic City in the period leading up to the valuation dates. There is, therefore, no expert opinion in the record on which the court could rely in making a value determination under the comparable sales approach.
C. Adoption of The Value Opinion of Plaintiffs Second Appraisal Expert.
The weight to be given to an expert’s opinion depends especially upon the facts and reasoning which are offered as the foundation of his [or her] opinion. Ocean County v. Landolfo, 132 N.J.Super. 523, 528, 334 A.2d 360 (App.Div.1975). The weight and value of expert testimony are for the trier of fact. Robbins v. Thies, 117 N.J.L. 389, 398, 189 A. 67 (E & A 1937). An expert’s opinion may be adopted in whole or in part or completely rejected. Middlesex County v. Clearwater Village, Inc., 163 N.J.Super. 166, 174, 394 A.2d 390 (App.Div.1978), certif. denied, 79 N.J. 483, 401 A.2d 239 (1979).
[Ginnetti, supra, 17 N.J.Tax at 362.]
The court had the opportunity during live testimony to weigh the credibility of all of the experts at trial.[7] Because the matter was tried without a jury, as is the ease in all Tax Court proceedings, in addition to the many questions asked of the experts by counsel, the court posed a limited number of questions to the witnesses to assist in clarifying their testimony. In addition, the court reviewed the written reports of the experts, examined the numerous documents admitted into evidence, read the transcripts of each day of trial, and reviewed the post-trial submissions of the parties. While the court finds that each expert expressed a sincerely held opinion with respect to the true market *525 value of the subject property, the court concludes that plaintiffs second appraisal expert presented the most credible opinion of the true market value of the subject property on the two valuation dates.
The opinion of plaintiffs second appraisal expert was based on the most thorough and detailed analysis of the Atlantic City casino-hotel market, national economic trends, the growth in regional competition and the operating history of the subject property. The court finds credible the expert’s determination of net operating income for the subject at a stabilized amount that reflects the effective reset of the gaming industry as a result of the growth of casino-gaming in Pennsylvania, New York, Delaware and Maryland. The record contains convincing evidence that the decline in revenue at the Borgata in the years leading to the valuation dates was not the result of a temporary drop in the casino-hotel market or transitory economic factors. As discussed in greater detail above, by the first valuation date, the near monopoly enjoyed by Atlantic City casino-hotels for decades had ended. Numerous casinos in areas convenient to the Borgata’s customer base in other States had been constructed or were planned. The trend continued through the second valuation date, further tightening what had become a difficult competitive market. In addition, the well-documented downturn in the national economy, evidenced by startling developments in the financial markets in the period around October 1, 2008 had solidified into a deep economic crisis by October 1, 2009. There was little evidence on those dates that economic conditions would in the near-term improve to a degree that would restore the revenue figures that the Borgata once enjoyed. While the Borgata continued to lead the Atlantic City casino-hotel market, its dimmed revenue earning potential would have been obvious to participants in the casino-hotel market as of both of the valuation dates. Plaintiffs second appraisal expert credibly captured this reality in her net operating income estimates and capitalization rates for the two tax years.
Defendant’s appraisal expert did not adequately account for the change in the national economy and the Atlantic City casino-hotel market when she estimated net operating income for the Borgata. *526 Her attempt to stabilize future net operating income for the subject property by averaging actual income data from 2006, 2007, 2008 and 2009 lacks credibility for several reasons. First, as noted above, the credible evidence in the record established that declining revenue at the subject was not the result of transitory influences. The regional competitive environment had changed in a fundamental way. Atlantic City casino-hotels, including the Borgata, were, by October 1, 2008, in a new reality of decreased revenue and increased marketing expenses arising from the expansion of casino gaming in surrounding States. By averaging net income figures from the years before these changes with net income figures from the years after these changes, defendant’s appraisal expert inflated net operating income in a way that lacks credibility.
In addition, the Appellate Division has twice held that simple averaging is not an appropriate appraisal technique. In Rodwood Gardens, Inc. v. City of Summit, 188 N.J.Super. 34, 40-42, 455 A.2d 1136 (App.Div.1982), the court rejected an expert’s averaging of a property’s actual, annual four-year income figures to determine future net operating income under the income approach. The court held that mechanical calculation of an average of historical income figures failed to result in “an informed estimate of the probable prospective income from the property” through analysis of market data. Id. at 43, 455 A.2d 1136. The court noted that “projected gross income estimate for appraisal purposes may be quite different from actual past or current figures.” Id. at 42, 455 A.2d 1136. Similarly, in Pansini Construction Design Assocs., LLC v. City of Ocean City, 407 N.J.Super. 137, 146, 969 A.2d 1163 (App.Div.2009), the court rejected a trial court’s averaging of adjusted sales prices of comparable sales to determine value under the comparable sales approach. The court noted that averaging has the potential to skew outcomes and is not an appropriate substitute for the informed and reasoned weighing of data to reconcile evidence of value. The use of averaging by defendant’s expert, while intended to reach a stabilized net operating income, negated the most recent downward trend in the *527 Atlantic City casino-hotel market and included in the calculation historic high figures which may never be achieved again.
In addition, defendant’s expert used in her averaging calculation actual net income data from 2009. It is axiomatic that, in tax appeal eases, “the valuation, although based upon a forecast of earnings, must be found upon what was known and anticipated as of the assessing date, unaided by hindsight.” City of New Brunswick, supra, 39 N.J. at 545, 189 A.2d 702; see also Tamburelli Props. Ass’n v. Borough of Creskill, 17 N.J.Tax 600, 601 (App.Div.1998), certif. denied, 157 N.J. 646, 725 A.2d 1127 (1999); 200 43rd Street, LLC v. City of Union City, 16 N.J.Tax 138, 141 (Tax 1996). As of October 1, 2008, market participants could not have been aware of the 2009 income data because it did not exist. That data, therefore, could not possibly have been considered by the hypothetical buyer and hypothetical seller on the valuation date for tax year 2009. Similarly, as of October 1, 2009, market participants would not have had a full year of income information for 2009. Defendant’s expert recognized the legal precedents that preclude an expert from using post-valuation-date information to formulate an opinion of value for tax appeal purposes. She explained her departure from the legal standard as necessary in light of the extraordinary changes underway in the Atlantic City casino-hotel market and at the subject property on and immediately after the valuation dates. The court concludes that the record contains no credible justification for departing from the long-established rule articulated by the Supreme Court in City of New Brunswick.
The court also finds that the income approach opinion of defendant’s expert lacks credibility because she did not extract the value of the Borgata’s business enterprise through application of an artificial management fee. All three appraisal experts agreed that where a property is likely to be sold along with other assets of an ongoing business enterprise it is necessary to extract from the value conclusion the value of personal property and the value of the business. This extraction of value is necessary because New Jersey law assesses local property tax on real property only. *528 Our courts have regularly applied what has been called the Rushmore approach to estimate business value in these circumstances. See Prudential Ins. Co., supra; Westmount Plaza, supra. The appraisal theory is that by hypothesizing that the property owner employs a professional management agent to take over the day-to-day operations of the business enterprise, the property owner is in the position of a passive investor in real property who makes no profit from the business operation at the property. The business value — deducted in the form of a hypothetical market rate management fee — represents the value of the business enterprise.
As this court explained in Westmount Plaza,
Plaintiffs expert adjusted for the hotel’s business value by extracting from hotel revenues the fee customarily paid to a management company pursuant to a management contract. This is a method sanctioned by the appraisal community. See e.g., Rushmore, Hotels, Motels and Restaurant: Valuations and Market Studies (1983) at 105-106; Nelson, Messer and Allen, “Hotel Enterprise Valuation,” The Appraisal Journal (April 1988) at 163-164____
[11 N.J.Tax at 135.]
Defendant’s expert did not make a hypothetical management fee deduction because she was of the opinion that the salaries and benefits paid to high-level management employees at the Borgata already effectively served as a management fee for the operation of the casino-hotel. The court finds the expert’s analysis to lack credibility for several reasons. First, the expert could not identify with precision the amount paid to those employees as compensation for services. According to her testimony, her efforts to determine the salaries and benefits paid to these employees were unsuccessful. As a result, she could not offer an opinion on whether the compensation represented the market rate for a management fee for a casino-hotel. The expert merely assumed that plaintiff was paying high-level management the equivalent of a market management fee. Second, to accept the expert’s opinion in this regard would equate to a determination that plaintiff is content to distribute all of the value of its casino-hotel business to its high-level employees as compensation for their services. The high-level employees to whom defendant’s expert refers do not own the Borgata. The court finds as lacking in credibility the *529 proposition that plaintiff, a limited partnership of two publically traded entities, is effectively in a the position of a passive real property owner who allows a handful of high-level employees to take all of the profits of the Borgata casino-hotel as compensation. The court concludes that the hypothetical management fee offered by plaintiffs second appraisal expert, who happens to be the business partner of Steven Rushmore, the appraiser for whom the Rushmore approach has been named, to be the more credible method for extracting business value from the subject property.
Finally, the court concludes that the capitalization rate offered by defendant’s appraisal expert lacks credibility. The overall capitalization rate is an “income rate for a total real property interest that reflects the relationship between a single year’s net operating income expectancy and the total property price or value----” Appraisal Institute, The Appraisal of Real Estate 462 (13th ed 2008). Selection of a capitalization rate “is often one of the most difficult aspects of valuing” property and, “[tjherefore, a thorough study ... is a must.” Gale & Kitson, supra, 26 N.J.Tax at 281.
“[W]hat is required is that reliable market data be furnished to the court as the basis for the expert’s opinion so that the court may evaluate the opinion.” Glen Wall Assoc, [v. Township of Wall, 99 N.J. 265, 279-80, 491 A.2d 1247 (1985) 1. The “probative value of an expert’s opinion depends entirely upon the facts and reasoning adduced in support of it.” Kearny Leasing Corp. v. Town of Kearny, 6 N.J.Tax 363, 376 (Tax 1984), aff'd, 7 N.J.Tax 665 (App.Div.), certif. denied, 102 N.J. 340 [508 A.2d 215] (1985). Stated otherwise, an “expert’s conclusion rises no higher than the data which provide the foundation.” Town of West Orange v. Goldman, 2 N.J.Tax 582, 588 (Tax 1981); See 43 New Jersey Practice, State and Local Taxation, sup>'a, at 111 (“the determination of the appropriate [capitalization] rate depends upon the credible evidence and the persuasive powers of the experts”).

[Ibid.]

Defendant’s expert selected a capitalization rate from data relating to sales of hotels not associated with casinos. Casino-hotels, however, are not operated in the same manner as non-casino hotels. As Judge Bianco noted, the “nature of the casino business, even with overnight accommodations available, is vastly different from that of a conventional hotel.” Ace Gaming, supra, 23 N.J.Tax at 89. Room rentals, occupancy and other factors associated with a casino-hotel are closely associated with gaming *530 operations. Revenue from the rental of hotel rooms, which accounts for most or all of the income generated by non-casino hotels, generally is a small percentage of the income generated by a casino-hotel, which derives the vast majority of its revenue from gaming. This is true of the subject property.
Another significant difference between casino hotels and non-casino hotels, as adduced during the trial, is that casino-hotel operators frequently offer gaming patrons free rooms in order to encourage continued gaming. Non-casino hotels have little incentive to give customers free rooms. In addition, the investment risks associated with casino-hotels differ in significant ways from the risk associated with non-casino hotels, in light of the fact that casino-hotel revenues are tied to the competitive gaming environments for their locality. Casino-hotels carry the risk of a large loss in gaming operations, as well as the higher risk associated with the close regulation of the casino industry. In addition, casino-hotels are more difficult to manage than non-casino hotels, given the complexity of the casino-hotel’s relationship to gaming activities. Defendant’s expert undertook no analysis of differences in risks, revenues, expenses, occupancy levels or room rates between casino-hotels and non-casino hotels when selecting a capitalization rate.
The court finds that the capitalization rate of plaintiffs second appraisal expert, derived from the EBITDA multiples of casino-hotel sales, as well as the analysis of financial firms that monitor the casino-hotel industry, is the more credible evidence of an appropriate capitalization rate for the subject property.
In light of these findings, the court adopts the conclusions of value of plaintiffs second appraisal expert: $880,000,000 as of October 1, 2008 and $870,000,000 as of October 1, 2009.
D. Calculation of Value of the Subject Property.
Pursuant to N.J.S.A. 54:51A-6c, commonly known as Chapter 123, in a non-revaluation year, when both the ratio of the assessed value of the subject property to its true value and the average ratio of the municipality exceed the county percentage level (in *531 this ease 100%), the assessment shall be revised by applying the county percentage level (100%) to the true market value of the subject property. This is the case with respect to both tax years at issue here.
The formula to determine the subject property’s ratio of assessed value to true value is:
Assessment True Value = Ratio
1. Tax Year 2009
$2,260,470,200 $880,000,000 = 2.57
As noted above, the average ratio for Atlantic City for tax year 2009 is 100.46%. See N.J.S.A 54:1-35a(a). Both figures exceed 100%. Consequently, the court will issue Judgments setting the assessment on the subject property for tax year 2009 at 100% of its true market value. The assessments will be allocated among the relevant parcels as follows (the allocations roughly reflect the percentage allocations in the original assessments):
[[Image here]]
2. Tax Year 2010
$2,262,391,300 -s- $870,000,000 = 2.60
As noted above, the average ratio for Atlantic City for tax year 2010 is 102.16%. See N.J.S.A. 54:1-35a(a). Both figures exceed 100%. Consequently, the court will issue Judgments setting the assessment on the subject property for tax year 2010 at 100% of its true market value. The assessments will be allocated among the relevant parcels as follows (the allocations roughly reflect the percentage allocations in the original assessments):
*532 [[Image here]]

 The subject property is the beneficiary of rights under a reciprocal easement between MAC Corp. and MDDC that includes two parcels, Block 576, Lot 1.04 and 1.06, commonly known as the Ring Road, a privately owned roadway. The agreement concerns utilities, infrastructure, and access rights benefiting the subject property. The assessments on the Ring Road parcels are not before the court.

 Notably, on April 30, 2008, the governing body of Atlantic City adopted an ordinance banning smoking on all casino gaming floors effective October 15, 2008. Atlantic City Ord. 27-2008. On October 27, 2008, shortly after the ban took effect, the municipality's governing body amended the smoking ban to apply only to 75% of casino gaming floors, effective immediately. Atlantic City Ord. 95-2008. The smoking ban's effect on casino revenue in the City is not clear from the record. Plaintiff’s experts suggested that casino revenue was harmed *484 by smokers electing to frequent casinos outside of New Jersey that do not ban smoking. They did not, however, precisely quantify the effect of the partial smoking ban. The municipality's expert testified that the effect of the partial smoking ban on revenue has not been determined with certainty and that smoking bans were in place in competing markets. The court concludes that there is insufficient evidence in the record to make a finding of fact quantifying the impact, if any, of Atlantic City's partial smoking ban on the value of the subject property.

 The municipality’s appraisal expert testified that she was unaware of the Treasure Island sale at the time that she completed her appraisal report. She did not rely on the Treasure Island sale to determine a capitalization rate. She relied instead on published capitalization rates for non-casino hotel sales. During her testimony, defendant's expert pointed out that a financial firm that monitors the casino-hotel industry reported an EBITDA multiple for the Treasure Island sale of 9.2. This figure was based on the Treasure Island’s trailing 12 months of EBITDA prior to the March 2009 closing date. Because income at the Treasure Island was declining between December 2008 and March 2009, use of the March 2009 figures resulted in a higher EBITDA multiple. The court adopts as credible the opinion of plaintiff's second appraisal expert with respect to the EBITDA multiple of the Treasure Island sale.

 Plaintiff's first appraisal expert rejected the comparable sales approach for three reasons. First, he was of the opinion that comparable sales are not used by participants in the casino-hotel marketplace and would not, therefore, reflect the sales price that would be reached by a hypothetical seller and hypothetical buyer in the marketplace. Second, the expert could not identify a reliable comparison measure (e.g., square footage, number of hotel rooms, number of gaming positions) on which to make an accurate comparison of casino-hotel sales. Third, the expert could identify no non-distress sales in Atlantic City on which to rely, rendering the comparable sales approach less reliable. The expert undertook a superficial cost approach analysis as a “check” on his value conclusion under the income approach. He did not, however, give any weight to the cost approach when reaching his final value conclusion.

 Plaintiff's second appraisal expert originally reported a purchase price of $775 million. She conceded during cross-examination that a $20 million discount realized by the purchaser because he made an early payment of debt reduced the purchase price to $755 million. Her EBITDA multiple for the transaction was revised accordingly. This revision did not alter the expert's EBITDA multiple for the subject property or her ultimate opinion of value.

 $181,233,262 x 5.52 actually equals $1,000,407,606. Plaintiffs second appraisal expert used unrounded figures when making her calculations, but used rounded figures for purposes of presentation in her report. The unrounded figures from the expert's report are included in the court’s opinion, given that the expert relied on the unrounded figures when determining the true market value of the subject property.

 Plaintiff's first appraisal expert began his live testimony in the courtroom. His testimony was stopped before its conclusion at the end of a trial day. The expert completed his testimony before the court via live video feed from Reno, Nevada on a subsequent date due to scheduling concerns. Plaintiff's second appraisal expert testified live in the courtroom on several days. Her courtroom testimony was supplemented by a day of videotaped testimony. The court reviewed the videotape and transcript of that testimony before the conclusion of trial.