**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0487-22

LIBERTY & PROSPERITY 1776,
INC., a non-profit corporation of
New Jersey, JAMES MCLEAN, a
taxpayer of Atlantic City and
Atlantic County, New Jersey, and
KAREN BOREK and JANIS
HETRICK, residents and
taxpayers of Atlantic County,
New Jersey,

      Plaintiffs-Respondents,

v.

THE STATE OF NEW JERSEY
and PHILIP D. MURPHY, in his
capacity as GOVERNOR OF THE
STATE OF NEW JERSEY,

      Defendants-Appellants.

_____

Argued March 20, 2024 – Decided October 21, 2024

Before Judges Vernoia, Gummer, and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Docket No. L-0170-22.

Tim Sheehan, Deputy Attorney General, argued the cause for appellants (Matthew J. Platkin, Attorney General, and Chiesa Shahinian & Giantomasi PC, attorneys; Michael L. Zuckerman, Deputy Solicitor General, Jean P. Reilly, Assistant Attorney General, Melissa H. Raksa, Assistant Attorney General, Amy Chung, Deputy Attorney General, Abiola G. Miles, Deputy Attorney General, Victoria G. Nilsson, Deputy Attorney General, Tim Sheehan, Deputy Attorney General, of counsel and on the briefs; John Lloyd, Ronald L. Israel, Brian P. O'Neill, on the briefs).

Seth Grossman argued the cause for respondents.

The opinion of the court was delivered by

GUMMER, J.A.D.

Plaintiffs – a non-profit corporation, an owner of taxable real estate within the City of Atlantic City, and residents and owners of taxable real estate within Atlantic County – challenged the Casino Property Tax Stabilization Act (CPTSA or Act), N.J.S.A. 52:27BBBB-18 to -28, and its 2021 amendment, L. 2021, c. 315 (2021 amendment or Amendment). In the CPTSA, the Legislature established a "payment in lieu of taxes" (PILOT) program for casino gaming properties located in Atlantic City. In the 2021 amendment, the Legislature altered the formula for calculating the PILOT payments.

In 2022, plaintiffs filed a complaint in lieu of prerogative writs, seeking a declaration the CPTSA was not constitutionally permissible under the

Uniformity Clause set forth in Article VIII, Section 1, Paragraph 1 of the New Jersey Constitution and the 2021 amendment was null and void. Defendants moved to dismiss the complaint; plaintiffs cross-moved for summary-judgment.

The motion court granted in part and denied in part each motion. The court found the Legislature had passed the CPTSA:

> to prevent the insolvency of Atlantic City, to facilitate the municipality's rehabilitation and recovery, and to protect the citizens not only of the City, but of Atlantic County, the region and the State from the ramifications of what would have otherwise been the imminent financial collapse of a tax base which uniquely funds State programs for senior citizens and disabled adults.

Holding the CPTSA had been "enacted for a public purpose" and had "indisputably fulfilled that public purpose for the benefit of residents of the City, the County, and the State," the court concluded the CPTSA fell within the Exemption Clause of Article III, Section 1, Paragraph 2 of the Constitution and dismissed the part of the complaint in which plaintiffs sought a declaration the CPTSA was unconstitutional. The court nevertheless found the Legislature had not acted rationally or in furtherance of a public purpose in enacting the 2021 amendment to that Act and, in an August 29, 2022 final judgment, declared the 2021 amendment null, void, and of no effect.

Defendants appeal from the portion of the judgment nullifying the Amendment. They argue plaintiffs did not overcome the strong presumption of validity vested in the Amendment. They contend the Amendment, like the Act whose formula it seeks to adjust, rationally advances public purposes and falls within the Exemption Clause.

Plaintiffs did not appeal from the portion of the judgment regarding the constitutionality of the CPTSA. Thus, it is undisputed the CPTSA wasn't a subsidy favoring a particular type of business or a tax break for a failing industry but instead, as the court found, served a public purpose that benefited citizens of the local community and across the State.

Plaintiffs now seem to accept some, if not most, of the Amendment's provisions. Plaintiffs, for example, embrace the Amendment's two-percent upward adjustment in the PILOT payments under certain conditions, see N.J.S.A. 52:27BBBB-20(f); they just complain the percentage is "not nearly" enough. Plaintiffs focus their criticism on one aspect of the Amendment: the Legislature's exclusion of "revenue derived from Internet casino gaming and Internet sports wagering during calendar years 2021 through 2026" from the definition of "[g]ross gaming revenue." See N.J.S.A. 52:27BBBB-20(a).

A-0487-22

Defendants, in reply, fault plaintiffs – and the motion court – for viewing the provisions of the Amendment in isolation, rather than considering them as a "cohesive whole," linked to the constitutional Act and part of a decades-long comprehensive legislative scheme. We agree and, accordingly, reverse the court's striking of the Amendment as unconstitutional.

I.

To put the CPTSA and its 2021 amendment in perspective, we provide some historical background regarding legislative acts and constitutional amendments concerning Atlantic City and the casino-gaming business.

In November 1976, New Jersey voters approved an amendment to our State's Constitution that enabled the Legislature to authorize the establishment and operation of gambling casinos in Atlantic City. N.J. Const. art. IV, § 7, ¶ 2(D) (the Casino Clause); see also State v. Trump Hotels & Casino Resorts, Inc., 160 N.J. 505, 510 (1999). The Casino Clause also permitted the Legislature "to license and tax such operations and equipment used in connection therewith." Pursuant to the Casino Clause, any law authorizing the operation or establishment of gambling casinos had to "provide for the State revenues derived therefrom to be applied solely for the purpose of providing funding" that would assist "eligible senior citizens and disabled residents of the State" by reducing

A-0487-22

their property taxes, rent, and utility charges and by expanding their access to health and transportation services or benefits. N.J. Const. art. IV, § 7, ¶ 2(D). By "State revenues," the Legislature meant "the proceeds of a tax, initially imposed at the rate of eight percent, on the annual gross winnings of casinos"; it did not mean "the proceeds of other taxes, such as corporate, sales and property taxes." Trump Hotels, 160 N.J. at 529.

In accordance with the Casino Clause, the Legislature in 1977 enacted the Casino Control Act (the CCA), N.J.S.A. 5:12-1 to -233. In passing the CCA, the Legislature found legalized casino gambling was "a unique tool of urban redevelopment for Atlantic City" that would "facilitate the redevelopment of existing blighted areas" and "attract new investment capital to New Jersey in general and to Atlantic City in particular." N.J.S.A. 5:12-1(b)(4). Our Constitution provides that "[t]he clearance, replanning, development or redevelopment of blighted areas shall be a public purpose and public use" and that "improvements made for these purposes and uses, or for any of them, may be exempted from taxation . . . for a limited period of time . . . ." N.J. Const. art. VIII, § 3, ¶ 1 (the Blighted Areas Clause). The Legislature also found Atlantic City's tourism industry was "a critically important and valuable asset"

6

to the State and that "the economic stability of casino operations [was] in the public interest." N.J.S.A. 5:12-1(b)(2), (12).

The CCA imposed an annual tax on "gross revenues" equal to eight percent of those revenues. N.J.S.A. 5:12-144(a). "Gross revenue" originally was defined in the CCA as "all sums . . . actually received by a licensee from gaming operations, less only the total of all sums paid out as winnings to patrons." N.J.S.A. 5:12-24 (1977). The proceeds collected from the tax were to be deposited in the Casino Revenue Fund, N.J.S.A. 5:12-145(a), and used exclusively for the purposes identified in the Casino Clause benefitting eligible senior citizens and disabled residents, N.J.S.A. 5:12-145(c).

The CCA also "required all casinos whose annual gross revenue exceeded their cumulative investments in the State to make annual investments in land and real property improvements in Atlantic City and other parts of the State, commencing after five years had elapsed, equal to two percent of gross revenues." Trump Hotels, 160 N.J. at 521; see also N.J.S.A. 5:12-144 (b) to (d). A casino that failed to make the required capital investments had to pay "an annual investment alternative tax [(IAT)] equal to two percent of gross revenue and payable to the Casino Revenue Fund." Id. at 511 (citing N.J.S.A. 5:12-144(e)).

Casinos, however, made "little or no such investments . . . during the seven years after the [CCA] took effect." Ibid. In 1984, the Legislature "revised the prospective investment obligations of casinos" and created the Casino Reinvestment Development Authority (CRDA). Ibid. (citing N.J.S.A. 5:12-153). Again recognizing "the casino gaming industry as a unique tool of urban redevelopment for the city of Atlantic City," the Legislature identified several purposes of the CRDA, including "to directly facilitate the redevelopment of existing blighted areas," "to address the pressing social and economic needs of the residents of the city of Atlantic City and the State of New Jersey by providing eligible projects in which licensees shall invest," and "to provide licensees with an effective method of encouraging new capital investment in Atlantic City, which investment capital would not otherwise be attracted . . . by normal market conditions . . . ." N.J.S.A. 5:12-160(a), (b). To enable the CRDA to achieve those purposes, "the Legislature provided casinos with the option of either paying an additional annual 2.5 percent [IAT] on gross revenues . . . or of investing annually 1.25 percent of such gross revenues in CRDA bonds or in investment projects approved by the CRDA." Trump Hotels, 160 N.J. at 511 (citing N.J.S.A. 5:12–144.1).

Atlantic City subsequently experienced a "long-held near monopoly on East Coast gaming." Marina Dist. Dev. Co. v. City of Atl. City, 27 N.J. Tax 469, 476 (Tax 2013), aff'd o.b., 28 N.J. Tax 568 (App. Div. 2015). In 2006, Atlantic City casinos paid $417,528,000 to the State pursuant to the CCA's annual eight-percent tax on "gross revenues." N.J. Div. of Gaming Enf't, Summary of Gaming and Atlantic City Taxes and Fees 2 (May 2022). But in 2007, that number fell to $393,707,000. Ibid.

"[B]eginning in 2007 . . . powerful forces were combining to undermine the Atlantic City casino-hotel market in ways that threatened lasting adverse economic consequences." Marina, 27 N.J. Tax at 475. By 2008, it was "readily apparent" that Atlantic City's "near monopoly . . . was rapidly being eroded by the expansion of casino gaming in nearby States." Id. at 476. In addition, "[t]he national economy began to soften in late 2007, primarily due to the subprime housing crisis," and by late 2008, "the economy suffered a significant downturn triggered by the collapse of the mortgage markets" and major investment banks. Id. at 481. "[T]he Atlantic City gaming industry was showing signs of distress," with plans for the construction of new casino-hotels being put on hold and other casino-hotels filing for bankruptcy. Id. at 483-84. The amount of the proceeds

collected pursuant to the CCA's annual eight-percent gross-revenue tax continued to fall. N.J. Div. of Gaming Enf't, at 2.

The owner of the Borgata Casino complex successfully challenged the property tax assessments set by Atlantic City's municipal tax assessor for the 2009 and 2010 tax years, claiming they exceeded the true market value of the property. Marina, 27 N.J. Tax at 475. In a 2013 decision, a Tax Court judge issued judgments significantly reducing those assessments. Id. at 531-32. We affirmed that decision in 2015. Marina Dist. Dev. Co. v. City of Atl. City, 28 N.J. Tax 568 (App. Div. 2015). In 2015, 6,355 property tax appeals were filed in Atlantic City, nearly three times the number of appeals filed in 2008.[1]

The CPTSA was proposed in response to Atlantic City's "dire situation" and "fiscal challenges," which arose in part from casino closures and the "large property tax refunds" Atlantic City owed to the casinos that had successfully appealed their property tax assessments. Sponsor's Statement to S. 1715 (Feb. 29, 2016). The CPTSA's purpose was "to provide certainty to the casinos with respect to their financial obligation to Atlantic City, and to provide certainty to

---

[1] That data was provided in the statement of material facts plaintiffs submitted in support of their cross-motion for summary judgment and was supported by information contained in an email from a representative of the Atlantic County Board of Taxation, which was an attached exhibit to the certification plaintiffs' counsel submitted in support of plaintiffs' cross-motion for summary judgment.

A-0487-22

Atlantic City about the financial obligation of the casinos to Atlantic City, Atlantic County, and the Atlantic City School District." Ibid.

Enacting the CPTSA, the Legislature found it "appropriate . . . to address the extraordinary situation in Atlantic City by devising a program that avoids costly assessment appeals for both the casino operators and Atlantic City, and that provides a certain mandatory minimum property-tax related payment by casino properties that Atlantic City can rely upon each year." N.J.S.A. 52:27BBBB-19(h) (2016). The Legislature described Atlantic City as having experienced "an increase in unemployment due to the recent closing of four casino properties"; "a strain on [its] municipal budget due to property tax refunds required by successful assessment appeals of casino gaming properties; and an increased property tax burden on Atlantic City and Atlantic County residents based on the decreasing value of casino gaming properties." N.J.S.A. 52:27BBBB-19(c) (2016).

The Legislature declared the Act served a public purpose "because Atlantic City will be able to depend on a certain level of revenue from casino gaming properties each year, making the local property tax rate and need for State aid less volatile," citing "the interest of the revitalization of Atlantic City and the continuation of the casino industry and its associated economic benefits

11

to the State," the "unique recreational experience" casinos provide "to the residents of New Jersey," and the "support" casino revenues provide to "many social programs, such as property tax relief for seniors, medical assistance, housing for disabled residents, transportation assistance, and other social services programs for elderly and disabled New Jerseyans." N.J.S.A. 52:27BBBB-19(l), (m) (2016).

The Legislature also found it was "a primary public purpose" of the CPTSA "to stabilize the casino industry for the benefit of the casino employee workforce." N.J.S.A. 52:27BBBB-19(n) (2016). The CPTSA would "greatly enhance the ability of the casino gaming properties to adapt their business models to the changes in the regional casino gaming market, which will in turn allow them to remain open for business and to pay their employees good wages and benefits . . . for many years to come." Ibid. The Legislature determined the "ability to depend on a stable [PILOT] obligation" would "in turn help to stabilize the casino business models . . . , and the [Atlantic City] casino gaming properties w[ould] be better able to compete with out-of-State casino gaming properties in the region" and "to preserve, and perhaps grow, the many benefits that casino gaming has brought to the State, and more particularly, to the Atlantic City region." N.J.S.A. 52:27BBBB-19(m) (2016).

12

The CPTSA would achieve those goals in part by mitigating the impact of the fluctuations in the annual value of the casino properties, which is "greatly influenced by the performance of casino gaming properties in other nearby states and by extreme weather events like Super Storm Sandy." N.J.S.A. 52:27BBBB-19(g) (2016). The Legislature cited its constitutional authority "to grant property tax exemptions by general law" and declared that laws applying only to casinos, or "for economic purposes related to casino gaming," are constitutional. N.J.S.A. 52:27BBBB-19(i), (j) (2016). It explained that Atlantic City is "a special class unto itself for economic purposes related to casino gaming" because it is "the only municipality wherein casino gaming is authorized." N.J.S.A. 52:27BBBB-19(j) (2016). It further explained that "[c]asino gaming properties represent a unique classification of property that can be exempted from normal property taxation by general law, in favor of a certain guaranteed mandatory minimum payment in lieu of property taxes when it is primarily in the public interest to do so." N.J.S.A. 52:27BBBB-19(k) (2016).

In lieu of paying local property taxes, the CPTSA required the owner of a casino gaming property to sign a ten-year financial agreement with Atlantic City, promising to remit to the city that property's "allocated portion of the

13

annual amount of the" PILOT. N.J.S.A. 52:27BBBB-20(c)(1) (2016). The PILOT was to be calculated annually "using a formula implemented by the Local Finance Board, in consultation with" the Division of Gaming Enforcement, "using the following criteria": (1) "[t]he geographic footprint of the real property, expressed in acres, owned by each casino gaming property"; (2) "[t]he number of hotel guest rooms in each casino gaming property"; and (3) "[t]he gross gaming revenue of the casino in each casino gaming property from the calendar prior year." N.J.S.A. 52:27BBBB-20(c)(4) (2016).

Instead of relying on "gross revenue" as defined in N.J.S.A. 5:12-24 for the PILOT, the Legislature in enacting the CPTSA introduced the term "gross gaming revenue" (GGR). N.J.S.A. 52:27BBBB-20(a) (2016). It defined GGR as "the total amount of revenue raised through casino gaming from all of the casino gaming properties located in Atlantic City," as determined by the Division of Gaming Enforcement. Ibid.

The Legislature did not intend in the CPTSA to make a casino's PILOT payments for the years 2017 to 2021 greater than the casino's total real property tax obligation for 2015. N.J.S.A. 52:27BBBB-20(c)(4) (2016). For those first five years, a casino would receive a credit against its IAT obligation equal to the amount its total PILOT obligation exceeded its 2015 property tax. Ibid.

Whatever the total IAT amount was for any year, the portion not already pledged for CRDA bonds or other CRDA contractual obligations would be "allocated to Atlantic City for the purposes of paying debt service on bonds issued" before or after the enactment of the CPTSA.  N.J.S.A. 52:27BBBB-25 (2016).

The CPTSA also required casinos to make "additional payments" to the State through 2023, in an aggregate fixed amount that would be remitted to Atlantic City for use in its current-year budget.  N.J.S.A. 52:27BBBB-21(c) (2016).  The additional payments started at $30 million for 2016 and progressively decreased to $15 million for 2017, $10 million for 2018, and $5 million thereafter.  N.J.S.A. 52:27BBBB-21(a) (2016).

In 2018, after the United States Supreme Court found unconstitutional a federal law that made it unlawful for a state to license or authorize gambling on competitive sporting events, see Murphy v. Nat'l Collegiate Athletic Ass'n, 584 U.S. 453, 461, 486 (2018), the Legislature enacted a statute that authorized sports wagering at casinos and racetracks, L. 2018, c. 33.  See also N.J.S.A. 5:12A-10 to -19 (the Sports Wagering Act).  The Sports Wagering Act was preceded by a constitutional amendment about sports betting and a statute about internet gaming.

In 2011 the Casino Clause was amended to allow the Legislature to authorize "wagering at casinos or gambling houses in Atlantic City on the results of any professional, college, or amateur sport or athletic event," excluding "a college sport or athletic event that takes place in New Jersey or on a sport or athletic event in which any New Jersey college team participates regardless of where the event takes place." N.J. Const. art. IV, § 7, ¶ 2(D); see also Murphy, 584 U.S. at 462 (noting that in 2011, "New Jersey voters approved an amendment to the State Constitution making it lawful for the legislature to authorize sports gambling").

Internet gaming was authorized by statute in 2013. L. 2013, c. 27; see also N.J.S.A. 5:12-95.17 to -95.33. Internet gaming was defined as "the placing of wagers with a casino licensee at a casino located in Atlantic City using a computer network . . . through which the casino licensee may offer authorized games to individuals . . . who are physically present in this State." N.J.S.A. 5:12-28.1. "Internet gaming gross revenue" (IGGR) was defined as "the total of all sums actually received by a casino licensee from Internet gaming operations, less only the total of all sums actually paid out as winnings to patrons." N.J.S.A. 5:12-28.2. The Legislature exempted IGGR from the CCA's eight-percent tax on gross revenue and instead applied a fifteen-percent tax on IGGR. N.J.S.A.

5:12-95.19. The Legislature made IGGR subject to the IAT, except at double the rates established for gross revenue in the CCA, N.J.S.A. 5:12-144.1, meaning casinos had to pay an annual five percent IAT on IGGR or provide 2.5 percent of IGGR towards the alternative investment option, N.J.S.A. 5:12-95.19.

In passing the internet-gaming legislation, the Legislature found that "stop[ping] the illegal Internet gambling market" and controlling how Atlantic City casinos "accept wagers placed over the Internet for games conducted in Atlantic City casinos will assist and enhance the rehabilitation and redevelopment of existing tourist and convention facilities in Atlantic City consistent with the original intent of the [CCA] and will further assist in marketing Atlantic City . . . ." N.J.S.A. 5:12-95.17(i). The Legislature again recognized the "vital interest" the State and general public have "in the success of tourism and casino gaming in Atlantic City, . . . which by reason of its location, natural resources, and historical prominence and reputation as a noteworthy tourist destination, has been determined . . . to be a unique and valuable asset that must be preserved, restored, and revitalized." N.J.S.A. 5:12-95.17(c).

Pursuant to the Sports Wagering Act, the Division of Gaming Enforcement is authorized to issue sports wagering licenses to casinos, N.J.S.A. 5:12A-11(a) (2018), and a casino holding a sports wagering license may operate a sports pool, ibid., which is defined as "the business of accepting wagers on any sports event by any system or method of wagering," N.J.S.A. 5:12A-10 (2018). A casino holding a sport wagering license also "may conduct an online sports pool or may authorize an internet sports pool operator licensed as a casino service industry enterprise . . . to operate an online sports pool on its behalf." N.J.S.A. 5:12A-11(a) (2018). An online sports pool is defined as "a sports wagering operation in which wagers on sports events are made through computers or mobile or interactive devices and accepted at a sports wagering lounge through an [authorized] online gaming system . . . ." N.J.S.A. 5:12A-10 (2018). A sports wagering lounge is defined as "an area wherein a licensed sports pool is operated located in a casino hotel or racetrack." Ibid. A casino operating a sports wagering lounge can offer online sports wagering through an internet gaming affiliate, N.J.A.C. 13:69N-1.2(c), which is defined as a licensed "business entity . . . that owns or operates an Internet gaming system on the behalf of a licensed casino," N.J.S.A. 5:12-95.32.

18

Like IGGR, "sums received by the casino from sports wagering or from a joint sports wagering operation, less only the total of all sums actually paid out as winnings to patrons" were exempted from the CCA's tax on gross revenue. N.J.S.A. 5:12A-16. Instead, the Legislature imposed an 8.5 percent tax on those sums from on-premises sports wagering and a thirteen-percent tax on those sums from online sports wagering. Ibid. The Legislature also imposed on all sports-wagering revenue an additional tax of 1.25 percent, to be paid to the CRDA "for marketing and promotion of the City of Atlantic City." Ibid.

In the 2018 Sports Wagering Act, the Legislature also added the revenue from "sports pool operations" to the definition of GGR used in determining a casino's PILOT payment. N.J.S.A. 52:27BBBB-20(a) (2018). Without distinguishing between on-premises and online sports pools, the Legislature redefined GGR as "the total amount of revenue raised through casino gaming, including revenue from sports pool operations, from all of the casino gaming properties located in Atlantic City." Ibid.

In 2021, the Legislature amended the CPTSA, effective December 21, 2021. L. 2021, c. 315. In amending the CPTSA, the Legislature again acknowledged it had enacted the CPTSA "to address a dire financial circumstance that affected casino gaming properties in Atlantic City, and the

19

finances of the city itself." N.J.S.A. 52:27BBBB-19.1(a). The Legislature found the CPTSA had had a "stabilizing effect . . . on the finances of . . . Atlantic City and the casino gaming industry during the first five years of the law." N.J.S.A. 52:27BBBB-19.1(c). According to the Legislature, "Atlantic City's overall financial condition [was] more stable since the casino gaming properties began making PILOT payments" and that "financial stability benefit[ed] the casinos, their employees, property taxpayers in Atlantic City, and all New Jersey residents." Ibid.

The Legislature, however, found that that financial stability might be "adversely impacted by certain provisions in the [then] current version of the" CPTSA. N.J.S.A. 52:27BBBB-19.1(d). The Legislature specifically referenced the calculation of the annual PILOT payment, which the Legislature had designed such that "each casino gaming property would not pay more in the annual PILOT payments than it paid in property taxes in 2015," and the impending 2021 expiration of the IAT credit that a casino received when its PILOT payment exceeded its 2015 property tax. N.J.S.A. 52:27BBBB-19.1(d).

The Legislature also found the public health emergency declared in response to the COVID-19 pandemic had "negatively impacted tourism in Atlantic City by restricting the public's right to travel"; totally and then partially

closing casino gaming properties; "and closing other businesses that would have been visited by tourists to the city for months as well."  N.J.S.A. 52:27BBBB-19.1(e).  The Legislature was concerned the impact of those

> public health emergency limitations on Atlantic City's casino gaming properties w[ould] affect the finances of those casinos for the foreseeable future, and thereby impact their ability to pay the required PILOT payments to the city and . . . contribute to the quality of life of the State's senior and disabled residents who rely on casino revenue deposited into the Casino Revenue Fund to fund programs that reduce property taxes as well as utility assistance programs benefiting those residents.

> [Ibid.]

The Legislature declared it was a "compelling public purpose for the State to establish appropriate alternative obligations for the final five years of the" CPTSA by amending it to (1) "adjust policies to reflect the operations of existing casino gaming properties and to compensate for the impacts that the [COVID-19 pandemic] public health emergency . . . had and will continue to have on in-person and internet gaming"; (2) "lessen the financial impact of the end of the IAT crediting mechanism at the end of 2021 on the casino gaming properties"; and (3) "ensure that Atlantic City continues to receive sufficient PILOT payments and IAT payments to fund its municipal budget."  N.J.S.A. 52:27BBBB-19.1(f).  The Legislature further declared the amendments to be

in the best interest of the casino gaming industry which serves as a vital part of the economy of the State, in the best interests of Atlantic City, and in the best interests of the State's senior and disabled residents who rely on casino revenue . . . to fund programs that reduce property taxes as well as rentals, telephone, gas, electric, and utility charges.

[Ibid.]

The Legislature stated that its authority under the Exemption Clause "empowered" it "to grant property tax exemptions by general law" and that both its prior enactment of CPTSA and its enactment of the 2021 amendment were valid exercises of that authority. N.J.S.A. 52:27BBBB-19.1(g).

In the 2021 amendment, the Legislature, among other adjustments, redefined GGR for 2021 through 2026. While it retained the phrase "including revenue from sports pool operations" in the definition of GGR, the Legislature limited the phrase's application to revenue from on-premises sports pool operations by expressly excluding the revenue from online sports pool operations by adding this sentence to the definition: "For the purpose of determining the amount of the [PILOT] pursuant to this section, gross gaming revenue shall not include revenue derived from Internet casino gaming and Internet sports wagering during calendar years 2021 through 2026 as determined by the" Division of Gaming Enforcement. N.J.S.A. 52:27BBBB-20(a). That

22

additional language also made clear internet casino gaming revenue was now expressly excluded from GGR.  Ibid.

The 2021 amendment also provided for staged reductions from 2022 to 2026 in the credit a casino licensee would receive against its annual IAT obligation if its PILOT exceeded its 2015 property tax obligation.  N.J.S.A. 52:27BBBB-20(c)(5) to (9).  The 2021 Amendment modified the allocation of the annual aggregate IAT amount for 2022 to 2026.  The portion not already pledged for CRDA bonds or other CRDA contractual obligations would still be allocated for Atlantic City's debt service.  N.J.S.A. 52:27BBBB-25(b).  The remainder, up to a cap of $13.5 million in 2022 that would grow to $31.1 million in 2026, was to be allocated first to Atlantic City for "general municipal purposes" other than debt service, until that allocation was 2.5 percent greater than the allocation for the preceding year; the rest would then be allocated among the CRDA, the Clean and Safe Fund, and the Infrastructure Fund.  N.J.S.A. 52:27BBBB-25(b), (c).  The Legislature created in the 2021 amendment the Clean and Safe Fund and the Infrastructure Fund for Atlantic City's benefit.  N.J.S.A. 52:27BBBB-25(b), -27, -28.  The Legislature in the 2021 amendment extended by three years, to 2026, the casino gaming properties'

obligation to make additional payments to the State. N.J.S.A. 52:27BBBB-21(a).

## II.

"Our standard of review in determining the constitutionality of a statute is de novo." State v. Hemenway, 239 N.J. 111, 125 (2019). Engaging in that de novo review, we follow these guiding principles.

"[S]tatutes are presumed to be constitutional." In re M.U.'s Application for a Handgun Purchase Permit, 475 N.J. Super. 148, 190 (App. Div. 2023). When considering a facial challenge to the constitutionality of a statute, we "afford every possible presumption in favor of an act of the Legislature." Mack-Cali Realty Corp. v. State, 466 N.J. Super. 402, 423-24 (App. Div. 2021) (quoting Town of Secaucus v. Hudson Cnty. Bd. of Tax'n, 133 N.J. 482, 492 (1993)), aff'd o.b., 250 N.J. 550 (2022). "Reviewing courts are 'not limited to the stated purpose of the legislation and "should seek any conceivable rational basis"' to uphold it." Id. at 424 (quoting Strategic Env't Partners, LLC v. N.J. Dep't of Env't Prot., 438 N.J. Super. 125, 145 (App. Div. 2014) (quoting Secaucus, 133 N.J. at 494-95)). "Simply put, 'the courts do not act as a super-legislature.'" Ibid. (quoting Newark Superior Officers Ass'n v. City of Newark, 98 N.J. 212, 222 (1985)). "Only a statute 'clearly repugnant to the constitution'

will be declared void." Ibid. (quoting Secaucus, 133 N.J. at 492-93). We have "recognize[d] that, 'in the field of taxation, the Court has accorded great deference to legislative judgments.'" Id. at 424-25 (quoting Secaucus, 133 N.J. at 493).

"[T]he burden is on the party challenging the constitutionality of the statute to demonstrate clearly that it violates a constitutional provision." Ibid. (alteration in original) (quoting Newark Superior Officers, 98 N.J. at 222). "That burden is onerous." Ibid. "A presumption of validity attaches to every statute" and "'any act of the Legislature will not be ruled void unless its repugnancy to the Constitution is clear beyond a reasonable doubt.'" State v. Lenihan, 219 N.J. 251, 266 (2014) (quoting State v. Muhammad, 145 N.J. 23, 41 (1996)). "Even where a statute's constitutionality is 'fairly debatable, courts will uphold' the law." Ibid. (quoting Newark Superior Officers, 98 N.J. at 227).

In finding the Amendment unconstitutional, the motion court did not apply that standard. The court did not consider the decades of legislative and judicial findings recognizing the symbiotic and deep-rooted connection between Atlantic City, the casino industry, and the State as a whole. It did not consider its own conclusion that the Act was constitutionally permissible under the Uniformity and Exemption Clauses set forth in Article VIII, Section 1, of our

Constitution because it fell within a "public purpose" exemption. It did not treat the Amendment as an adjustment to the PILOT-payment formula set forth in that constitutional Act or recognize the Legislature's determination that an adjustment to the formula was appropriate to maintain the gains in the financial stability of Atlantic City obtained as a result of the Act. Rather than reading the Amendment in conjunction with the Act, the court analyzed the Amendment in isolation, untethered to the constitutional Act it was intended to amend, as if the public purpose served by the Act was wholly separate and apart from the Amendment. It wasn't.

Instead of "seek[ing] any conceivable rational basis" to uphold the Amendment, Secaucus, 133 N.J. at 495, the motion court rejected the Legislature's rational bases supporting its enactment. The court acknowledged courts must presume the Legislature's judgment was based on factual support when presented with no evidence establishing otherwise. See Reingold v. Harper, 6 N.J. 182, 196 (1951) (finding "Factual support for the legislative judgment is to be presumed. Barring a showing contra, the assumption is that the measure rests upon some rational basis within the knowledge and experience of the Legislature"); see also N.J. Shore Builders Ass'n v. Twp. of Jackson, 199 N.J. 38, 55 (2009) (same). The court nevertheless rejected the Legislature's

A-0487-22

stated conclusions and concerns that led to its enactment of the Amendment based on its determination that "facts on the record contradict[ed]" those conclusions and concerns. The court erred in doing so, especially because the record had not established that the "facts" on which the court had relied were actually available to the Legislature when it enacted the Amendment.[2] A court cannot render void a legislative act based on information it assumed the Legislature had or the twenty-twenty prism of future data amassed and presented after the enactment of a statute.

Given the concerns identified by the Legislature, it was not irrational for the Legislature to determine the CPTSA's formula for calculating PILOT payments should be amended. Reasonable minds might differ as to how the

---

[2] The court relied on a Division of Gaming Enforcement report entitled "Atlantic City Gaming Industry Summary of Gaming and Atlantic City Taxes and Fees," and monthly casino revenue reports submitted by casinos to the Division for the months of November and December 2021. The Division's report was dated May 23, 2022, more than five months <u>after</u> the enactment of the amendment. The casino revenue reports for December 2021 were submitted in January 2022, after the amendment's enactment. <u>See</u> Division of Gaming Enforcement, <u>Monthly Gross Revenue Reports</u>, New Jersey Office of Attorney General, https://www.njoag.gov/about/divisions-and-offices/division-of-gaming-enforcement-home/financial-and-statistical-information/monthly-gross-revenue-reports (last visited Oct. 14, 2024). And although the monthly reports for November 2021 were submitted to the Division on various dates in December 2021, it is not clear when the Division made those reports available on-line.

formula should have been amended but in such cases courts must defer to the Legislature's judgment.

> [O]ur Supreme Court has emphasized "the long established principle of deference to the will of the lawmakers whenever reasonable men might differ as to whether the means devised to meet the public need conform to the Constitution . . . [and] the equally-settled doctrine that the means are presumptively valid, and that reasonably conflicting doubts should be resolved in favor of validity."
>
> [Mack-Cali, 466 N.J. Super. at 429-30 (quoting City of Jersey City v. Farmer, 329 N.J. Super. 27, 46 (2000)).]

As we held in Mack-Cali, "[i]t is not for us to dispute the wisdom of the Legislature's choice." Id. at 430.

The motion court found it was "unclear whether the Legislature acted with . . . noble intentions in passing the Amendment." But that isn't the standard a court applies when considering the constitutionality of a legislative act. A court cannot rule a legislative act void "unless its repugnancy to the Constitution is clear beyond a reasonable doubt." Lenihan, 219 N.J. at 266 (quoting Brown v. City of Newark, 113 N.J. 565, 572 (1989)). When "a statute's constitutionality is 'fairly debatable, courts will uphold' the law." Ibid. (quoting Newark Superior Officers, 98 N.J. at 227). The motion court did not apply that high standard, and plaintiffs failed to meet it.

A-0487-22

For these reasons, we reverse the portions of the August 29, 2022 final judgment denying in part defendants' motion to dismiss the complaint, granting in part plaintiffs' summary-judgment motion, and declaring the 2021 amendment null, void, and of no effect. We otherwise affirm.

Affirmed in part; reversed in part.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

29